FILED - LN

July 5, 2022 2:49 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY ___ecd /___    SCANNED BY ___

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**1:22-cv-609**
**Jane M. Beckering**
**US District Judge**

UNITED STATES OF AMERICA and )
STATE OF MICHIGAN, ex rel. LINDSAY )
ZEVCHAK, )
                                      )

      Plaintiff-Relator, )

-vs- )

AARON KRAAI, LTD d/b/a DOCTORS )
OFPHYSICAL THERAPY, DPT HOLDINGS, )
L.L.C. d/b/a DOPT, LLC, AARON KRAAI, PT, )
DPT, JONATHAN BENDER, PT, DPT, )
KAREN VON STEENBURG-ALLEN, PT, )
MELANIE KRAAI, AND KATHERINE )
TODD, OTR/L, CHT, PTA, Jointly and )
Severally, )
                                      )

      Defendants. )

**Case No.**
**Hon.**
**Magistrate**

**FILED UNDER SEAL**

---

HERTZ SCHRAM PC
BY:  PATRICIA A. STAMLER (P35905)
       MATTHEW J. TURCHYN (P76482)
*Attorneys for Plaintiff-Relator*
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI  48302
(248) 335-5000
pstamler@hertzschram.com
mturchyn@hertzschram.com

---

## SEALED COMPLAINT AND DEMAND FOR JURY TRIAL

{H0924071.1}

Plaintiff Relator Lindsay Zevchak ("Relator") brings this qui tam action on behalf of herself and the United States of America and the State of Michigan, against the above-named Defendants for violations of the Federal False Claims Act (" FCA"),  31 U.S.C. §§ 3729 et seq., the Fraud Enforcement Recovery Act of 2009 ("FERA"),  31 U.S.C. §§ 3729-33 and the Michigan Medicaid False Claims Act ("MMFCA"), M.C.L. § 400.601 et seq., to recover all damages, civil penalties, and all other recoveries provided for under the FCA, FERA and the MMFCA.

## SEALED COMPLAINT

1.     Under the FCA, this complaint is to be filed in camera and remain under seal for a period of at least 60 days. 31 U.S.C. § 3730(b) (2).

2.     Under the MMFCA the complaint is to be filed in-camera and remain under seal for a period of at least 90 days. M.C.L. 400.610a.

3.     The complaint shall not be served on Defendants until the Court so orders following the intervention periods by the federal and state governments. 31 U.S.C. § 3730(b)(2); M.C.L. 400.610a(2).

4.     The federal government may elect to intervene and proceed with the action within 60 days after it receives both the Complaint and the material evidence disclosure. 31 U.S.C. § 3730(b)(2).

5.    The State of Michigan may elect to intervene and proceed with the action within 90 days after it receives both the Complaint and the evidentiary disclosure. M.C.L. 400.610a (3).

## INTRODUCTION

6.    This *qui tam* case centers on Defendants' submission of false claims to the federal and state governments based on several illegal schemes including: 1) pressuring Physical Therapists ("PT") and Occupational Therapists ("OT)" to provide services in excess of medical necessity in order to obtain increased billable units to inflate revenue, 2) pressuring PTs and OTs to use improper codes to obtain the greatest level of reimbursement (upcoding), 3) improper use of unlicensed therapy aides who lacked the requisite qualifications to provide OT and PT treatment, and 4) implementation of productivity standards leading to use of improper CPT codes and to simultaneous "treatment" of patients at the same time and falsely billing these services as one-on-one services.

## JURISDICTION AND VENUE

7.    This action arises under the Acts and the common law to recover treble damages and civil penalties on behalf of the United States of America and the State of Michigan arising out of Defendants' submission of fraudulent claims to the United States and the State of Michigan Governments through the federal Medicare and the federal and state Medicaid program.

{H0924071.1}                                3

8.    31 U.S.C. § 3732 provides that this Court has exclusive jurisdiction over actions brought under the federal FCA and concurrent jurisdiction over state claims arising from the transactions giving rise to the claims under the FCA. In addition, jurisdiction over this action is conferred on this Court by 28 U.S.C. § 1345 and 28 U.S.C. § 1331 because this civil action arises under the laws of the United States. Further, this Court has jurisdiction under 31 U.S.C. § 3732(b) over any action brought under the laws of any state for the recovery of funds paid by state or local government if the action arises from the same transaction or occurrence as an action brought under § 3732. This is also an action to obtain damages, assessments, civil monetary penalties, and exclusion from all federal health care programs pursuant to the CMPL, 42 U.S.C. §§ 1320a-7(b)(7) and 1320a-7a.

9.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 3732(a) of the FCA which provides that "any action under 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act prescribed by § 3729 occurred." The acts that are the subject of this action, occurred in this judicial district.

10.    As required under § 3730(b)(2) of the FCA, Relator provided to the Attorney General of the United States and to the United States Attorney for the Western District of Michigan, prior to the filing of this Complaint, statements of all

material evidence and information related to the Complaint (the "Evidentiary Disclosure"). Relator has also provided the Attorney General of the State of Michigan a copy of the Evidentiary Disclosure pursuant to M.C.L. 400.610a(2).

11. Relator is the original source of the information of the allegations contained in this Complaint.

## PARTIES

12. Relator Lindsay Zevchak ("Relator") is for all times relevant to this Complaint a resident of the City of Dewitt, Clinton County, Michigan, located in the Western District of Michigan and is an Occupational Therapist ("OT") licensed in Michigan.

13. Defendant Aaron Kraai, LTD is an Illinois corporation doing business as Doctors of Physical Therapy, ("DPT"), and is conducting business in East Lansing, and Lansing Michigan in the Western District of Michigan.

14. Defendant DPT Holdings, LLC, ("DPT") is an Illinois corporation certified to conduct business in Michigan and is transacting business in Michigan at 4660 S. Hagadorn Rd., Suite 160, East Lansing, Michigan and 4052 Legacy Parkway, Suite 100, Lansing, Michigan in the Western District of Michigan.

15. Defendant Aaron Kraai, PT ("A Kraai") is for all times relevant to this Complaint, the owner and CEO of DPT, and is a licensed PT Illinois, and is a resident of Naperville, Illinois.

16.    Defendant Jonathan Bender, PT ("Bender") is for all times relevant to the Complaint the Chief Operations Officer at DPT, is a licensed Physical Therapist in Illinois and is a resident of Illinois.

17.    Defendant Karen Von Steenburg-Allen, PT ("Von Steenburg-Allen") is for all times relevant to this Complaint is a licensed PT in Michigan and is a resident of Swartz Creek, Michigan, in the Eastern District of Michigan. Defendant Melanie Kraai ("M. Kraai") is for all times relevant to this Complaint DPT's Compliance Officer and on information and belief resides in Illinois.

18.    Defendant Katherine Todd, OTR/L, CHT, PTA ("Todd") is for all times relevant to this Complaint a licensed Physical Therapy Assistant ("PTA") in Michigan, is employed with Defendant DPT and on information and belief resides in Genesee County, in the Eastern District of Michigan.

## LEGAL FRAMEWORK

*Federal False Claims Act (Federal FCA)*

19.    The Federal FCA imposes liability on:

[A]ny person who—

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.] (31 U.S.C. §§ 3729(a)(1)(A) and (B)).

20.    The term "knowingly" means "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." (31 U.S.C. § 3729(b)(1)(A)). Proof of specific intent to defraud is not required. (See 31 U.S.C. § 3729(b)(1)(B)).

21.    Section 3729(a)(1) of the Federal FCA provides that a person is liable to the United States government for three times the amount of damages that the government sustains because of the act of that person plus a civil penalty of $5,000–$10,000 per violation. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (Pub. L. 101-410), as amended by the Debt Collection Improvement Act of 1996 (Pub. L. 104-134) and the Federal Civil Penalties Inflation Adjustment Act of 2015 (Pub. L. 114-74), the Federal FCA's penalty range is periodically adjusted for inflation. For Federal FCA violations that occurred on or before November 2, 2015, the penalty range is $5,500–$11,000 per violation. And for Federal FCA violations that occurred after November 2, 2015, the penalty range is presently $11,181–$22,363 per violation. (See 28 C.F.R. §§ 85.3 and 85.5 (2018)).

*Michigan Medicaid False Claims Act (MMFCA)*

22.    The MMFCA makes it unlawful for a "person" to:

a) make or present or cause to be made or presented to an employee or officer of this state a claim under the social

welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false,

b) make or present or cause to be made or presented a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, that he or she knows falsely represents that the goods or services for which the claim is made were medically necessary in accordance with professionally accepted standards. Each claim violating this subsection is a separate offense. A health facility or agency is not liable under this subsection unless the health facility or agency, pursuant to a conspiracy, combination, or collusion with a physician or other provider, falsely represents the medical necessity of the particular goods or services for which the claim was made.

c) knowingly make, use, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act.

d) A person who violates this section is guilty of a felony punishable by imprisonment for not more than 4 years or a fine of not more than $50,000.00, or both.

(M.C.L. § 400.607(1)-(4)).

23.    The term "knowing" and "knowingly" means that "a person is in possession of facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a Medicaid benefit." (M.C.L. § 400.602(f)). Additionally, "knowing" and "knowingly" include acting in deliberate ignorance of the truth or falsity of facts or acting in reckless disregard of the truth or falsity of facts." *Id*. Proof of specific intent to defraud is not required. *Id*.

24. In addition to repaying the State the full amount it received in connection with a false claim, a person who violates the Michigan Medicaid FCA is also liable for triple the amount of damages suffered by the State due to the person's conduct as well as a civil penalty of not less than $5,000 or more than $10,000 for each false claim submitted. (See M.C.L. § 400.612(1)).

## The Medicare and Michigan Medicaid Programs

### Medicare

25. The United States, through the Department of Health and Human Services (HHS) and Center for Medicare Services (CMS), administers the Medicare program primarily for persons 65 and older and the disabled. The Medicare program was established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*

26. The Medicare program is divided into "parts" that cover different services. Medicare Part A generally covers inpatient hospital services and services for patients with end-stage renal disease (ESRD). Medicare Part B generally covers outpatient physician services, including prescription drugs administered "incident to" physician services. Medicare Part C provides for private companies to offer "Medicare Advantage" plans that include, at a minimum, all benefits covered by Parts A and B. Medicare pays a fixed monthly amount per beneficiary to the private companies that offer Medicare Advantage plans.

27.    It is the obligation of every health care provider that seeks payment from Medicare to assure that services it provides "(1) will be provided economically and only when, and to the extent, medically necessary; (2) will be of a quality which meets professionally recognized standards of health care; and (3) will be supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing quality improvement organization in the exercise of its duties and responsibilities." (42 U.S.C. § 1320c-5(a)).

**Michigan Medicaid**

28.    Medicaid is a joint Federal-State program created in 1965 that provides health care benefits for certain groups, primarily the people who are indigent and/or disabled. Each state, including Michigan, administers a state Medicaid program. The Federal Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. (See 42 U.S.C. §§ 1396, 1396a(a)(13) & (a)(30)(A)).

29.    Providers participating in Michigan Medicaid submit claims for services rendered to Medicaid beneficiaries to Michigan Medicaid for payment. Michigan Medicaid directly pays providers for reimbursable items and services and obtain the Federal share of the payment from accounts that draw on the United States Treasury. (See 42 C.F.R. §§ 430.0 *et seq.*).

## Medicare Coverage for Physical and Occupational Therapies

30.    Medicare Part B covers doctors' services, outpatient care, medical supplies, and preventive services. https://www.medicare.gov/coverage

31.    Medicare Part B covers the costs of "medically necessary services and care in an outpatient setting, such as a doctor's office." *Id.* Medically Necessary is defined as "[h]ealth care services or supplies needed to diagnose or treat an illness, injury, condition, disease, or its symptoms and that meet accepted standards of medicine." *Id.*

32.    Generally, physical and occupational therapies are covered by Medicare Part B if "ordered by a physician or other health care provider certifies you need it." *Id.*

33.    Physical therapy "[e]valuates and treat injuries and diseases that change your ability to function" and "improves or maintains current function or slows decline." *Id.*

34.    Previously, there were limits on Medicare reimbursement, also known as the "therapy cap." In 2018, the therapy cap was removed. https://www.medicareinteractive.org/get-answers/medicare-covered-services/rehabilitation-therapy-services/outpatient-therapy-costs (last visited on 6-29-22).

35.     Medicare covers outpatient therapy at 80% of the Medicare-approved amount and the patient is responsible for 20% coinsurance after he/she has met the Part B deductible "($233 in 2022)." *Id.*

36.     If the total therapy costs reach a certain figure, Medicare requires the patient's provider to confirm that his/her therapy is medically necessary. "In 2022, Original Medicare covers up to": a) $2,150 for PT before the patient's provider is required to state that the "care is medically necessary" and b) $2,150 for OT before the patient's provider is required to indicate that the "care is medically necessary." *Id.*

37.     Medicare pays for up to 80% of the Medicare-approved amount, which means that Original Medicare covers up to $1,720 (80% of $2,150) before the provider is required to confirm the outpatient therapy services are medically necessary. *Id.*

38.     Occupational therapy is "[t]herapy to help you perform activities of daily living (like dressing or bathing)" and "helps to maintain current capabilities or slow decline." https://www.medicare.gov/coverage

39.     There is "no limit on how much Medicare pays for medically necessary outpatient therapy services in one calendar year." *Id.*

**Medicaid Therapy Services**

40.    Medicare Part B covers practitioner's services, outpatient hospital services, medical equipment and supplies, and other health care services. When a beneficiary is eligible for and enrolled in Medicare Part B, Medicare usually pays for a percentage of the approved Medicare Part B allowable charges and Medicaid pays the applicable deductible and/or coinsurance up to Medicaid's maximum allowable                    amount.                    https://www.mdch.state.mi.us/dch-medicaid/manuals/MedicaidProviderManual.pdf

41.    The Michigan Department of Health and Human Services ("MDHHS") Medicaid Provider Manual governs, in part, OT and PT services.

**2.7 Physical Therapists, Occupational Therapists, and Speech-Language Pathologists' Private Practice**

42.    PT, OT, and ST services may be provided to beneficiaries of all ages when provided by a Medicaid enrolled physical therapist, occupational therapist, or speech-language pathologist employed by an individual/sole, partnership, or group practice. These providers are eligible for direct reimbursement.

https://www.michigan.gov//media/Project/Websites/mdhhs/Folder3/Folder44/Folder2/Folder144/Folder1/Folder244/MSA_1829.pdf?rev=19b0023d18894d029cb7aeb03bcd6a9c at 5.

**2.8 Physician's Office or Clinic**

43.    PT, OT, and ST services may be provided to beneficiaries of all ages in a physician's office or one of the following clinics: Federally Qualified Health Center, Rural Health Clinic, Tribal Health Center, or Local Health Department.

*Id.*

### 4.2.D. Group Therapy PT

44.  PT is not covered by Medicaid when provided concurrently to a group of two or more individuals by the same therapist. Covered therapeutic procedures require direct (one-to-one) contact between the beneficiary and the therapist.

*Id.* at 21.

### 4.2.E. Serial Casting

45.  Serial casting is a process in which a joint(s) which lacks full range of motion is immobilized with a rigid or semi-rigid cast. During this procedure, the affected joint(s) is gradually and progressively set in a more anatomically correct alignment to improve joint alignment, increase muscle length, or to achieve a decrease in abnormal tone, resulting in an increase in the range of motion. Casts are applied and removed in succession, usually every week, until full range of motion, flexibility, or plateau is reached. Upon removal of each cast, the limb is stretched, and a new cast is applied to hold the limb in place. Serial casting is a covered benefit when performed by, or under the direct supervision of, a qualified therapist and defined in a treatment plan as a medically necessary therapy service for improving range of motion or reducing abnormal tone. The referral for therapy services must specifically indicate that the beneficiary is being referred for serial casting, or the prescribing provider must provide written concurrence, via signature, of any treatment plan that includes serial casting.

*Id.* at 21.

### 4.2.F. Prescription Requirements

46.  Outpatient and private practice therapy requires a prescription from a physician or other licensed practitioner practicing within their scope of practice as defined in State law for physical therapy. Home health and nursing facility therapy require a prescription from a physician for physical therapy. A treatment plan meeting all of the

requirements    below    is    considered    a    prescription.    The
prescription/treatment plan must contain all the following:

- Beneficiary's name;
- Beneficiary's date of birth;
- Prescribing practitioner's name, address, and telephone number;
- Prescribing practitioner's signature;
- The date the prescription was written;
- The frequency and duration of the therapy services; and
- Diagnosis. A copy of the prescription must be retained in the beneficiary's medical record. A prescription is valid for 90 days from the date that the prescription was written unless the termination date is otherwise stated by the authorized prescribing practitioner on the prescription.

*Id.*at 21-22.

47.    The PT treatment plan resulting from the evaluation must be medically

necessary, signed by the physical therapist, and include all the following:

- Time-related short-term goals that are measurable, functional, and significant to the beneficiary's function or mobility;
- Long-term goals that are measurable, functional, and identify specific maximum functional achievement for the requested authorization period;
- Functional outcome measures specific to maximum functional achievement for the current course of therapy (up to 12 consecutive months);
- Anticipated type, frequency, and duration of therapy required to meet short- and long-term goals;
- Documentation of collaboration between all therapy providers actively treating the beneficiary, if applicable;
- Plan for discharge from service; and
- Signature of the prescribing practitioner confirming agreement with the treatment plan.

*Id.* at 23.

"A treatment plan, including all the criteria" above, "must be submitted with the

prior authorization request."

*Id.*

## SECTION 4 – STANDARDS OF COVERAGE AND SERVICE LIMITATIONS

### 4.1 Occupational Therapy

48.    MDHHS uses the terms Occupational Therapy, OT, and therapy interchangeably. OT is covered when furnished by a Medicaid-enrolled therapy provider and the documentation is signed by the treating therapist. Medicaid reimburses for occupational therapy services when provided by any of the following:

A licensed occupational therapist.

A licensed occupational therapy assistant under the supervision of an occupational therapist (i.e., the occupational therapy assistant services must follow the evaluation and treatment plan developed by the occupational therapist, and the occupational therapist must supervise and monitor the occupational therapy assistant's performance with continuous assessment of the beneficiary's progress). All documentation must be reviewed and co-signed by the supervising occupational therapist.

*Id.* at 9.

49.    All documentation must be reviewed and co-signed by the supervising occupational therapist. OT is considered an all-inclusive charge. Medicaid does not reimburse for a clinic room charge in addition to therapy services unless the room charges are unrelated. MDHHS expects occupational therapists and occupational therapy assistants to utilize the most ethically appropriate therapy within their scope of practice as defined by state law or the appropriate national professional association. OT must be medically necessary, reasonable and required to achieve one or more of the following:

- Return the beneficiary to the functional level prior to illness or disability;
- Return the beneficiary to a functional level that is appropriate to a stable medical status;
- Prevent a reduction in medical or functional status had the therapy not been provided…Medicaid standard coverage allows the following: Outpatient/Private Practice Occupational Therapy Nursing Facility Occupational Therapy Home Health Occupational Therapy • Up to 144 units of OT per calendar year period. • Prior authorization is required for treatment that exceeds this unit limitation.

*Id.* at 9.

50.    OT is expected to result in measurable improvement that is significant to the beneficiary's ability to perform daily living tasks appropriate to his/her chronological, developmental, or functional status. *Also, functional improvements must be achieved in a reasonable, and generally predictable, amount of time as specified in the short- and long-term goals identified on the evaluation/re-evaluation and treatment plan.* Functional improvements must be maintainable.  *Id.* at 10. (Emphasis added).

51.    Critically, "Medicaid does not cover therapy if the beneficiary's maximum functional potential has been realized, the beneficiary has plateaued, or the therapy has no impact on the beneficiary's ability to perform age-appropriate tasks."[1]  *Id.*

52.    "Medicaid only covers OT services that require the skills, knowledge, and education of an occupational therapist. Medicaid does not cover interventions

---

[1] "[M]edically necessary habilitative therapy services may be covered under Early and Periodic Screening, Diagnosis and Treatment (EPSDT) or Healthy Michigan Plan.

provided by another practitioner or caregiver (e.g., registered nurse, physical

therapist, family member, teacher, etc.)." *Id.*

### 4.1.A. Duplication of Services

53.    Medicaid does not cover two disciplines working concurrently
on similar goals/areas (e.g., dysphagia, assistive technology,
sitting and standing balance/tolerance, etc.). Collaboration
between treating therapists is required to coordinate therapy and
prevent duplication of services. Documentation of the
collaboration must be retained in the beneficiary's medical
record for audit purposes.

*Id.* at 11.

### 4.1.D. Group Therapy

54.    OT is not covered by Medicaid when provided concurrently to
a group of two or more individuals by the same therapist.
Covered therapeutic procedures require direct (one-to-one)
contact between the beneficiary and the therapist.

*Id.* at 12. (Emphasis added).

### 4.1.F. Prescription Requirements

55.    Outpatient and private practice therapy require "a prescription from a

physician or other licensed practitioner practicing within their scope of practice as

defined in State law for occupational therapy". Further, [a] treatment plan meeting

all the requirements below is considered a prescription.

The prescription/treatment plan must contain all the following:
- Beneficiary's name;
- Beneficiary's date of birth;
- Prescribing practitioner's name, address, and telephone number;
- Prescribing practitioner's signature;

- The date the prescription was written;
- The frequency and duration of the therapy services;
- Diagnosis; and
- For swallowing or oral motor evaluation/treatment, the documentation must clearly specify allowance of trial feeds and/or oral intake during therapy).

All documentation, including the prescription, current plan of care, and prior authorization, must consistently substantiate this allowance. A copy of the prescription must be retained in the beneficiary's medical record. A prescription is valid for 90 days from the date that the prescription was written unless the termination date is otherwise stated by the authorized prescribing practitioner on the prescription. If the beneficiary has another insurance plan (e.g., Medicare or commercial insurance) and the service is a covered benefit, the provider must follow the requirements of the other insurance plan(s), including but not limited to, prescription, prior authorization, and provider qualifications. (Refer to the Coordination of Benefits chapter for more information.)

*Id.* at 13.

56.     The OT treatment plan resulting from the

evaluation must be medically necessary, signed by the occupational therapist, and include all the following:

- Time-related short-term goals that are measurable, functional, and significant to the beneficiary's function or mobility;
- Long-term goals that are measurable, functional, and identify specific maximum functional achievement for the requested authorization period;
- Functional outcome measures specific to maximum functional achievement for the current course of therapy (up to 12 consecutive months);
- Anticipated type, frequency and duration of therapy required to meet short- and long-term goals;
- Documentation of collaboration between all therapy providers actively treating the beneficiary, if applicable;

- Plan for discharge from service; and
- Signature of the prescribing practitioner confirming agreement with the treatment plan. A treatment plan, including all the criteria established above, must be submitted with the prior authorization request.

*Id.* at 15.

## GENERAL ALLEGATIONS

57.    DPT is a corporate physical therapy chain with clinics primarily in the Midwest, including IL, MI, and WI, and is in the business of providing free injury screening, therapists, and manual therapy techniques to patients/consumers. https://doctorsofphysicaltherapy.com.

58.    DPT employs PTs and OTs who focus on hand therapy. Hand therapy is a specialty practice area that assists people recovering from injuries, trauma or diseases that affect the upper extremity(ies).

59.    DPT offers manual therapy that can help with a wide variety of conditions, including: Chronic Pain, Fibromyalgia, Headaches, Arthritic Pain, and can provide Certified Functional Manual Therapists, Certified Manual Therapists and Certified Orthopedic Manual Therapists who can provide various therapeutic techniques including: Myofascial Release, Craniosacral Treatment, Cupping, Joint Mobilization / Manipulation, Scar Tissue Mobilization, Barral Technique and Pelvic Floor Muscular Release. *Id.*

60.    DPT offers Pre- ("Pre-Hab") and Post-Surgical hand and physical therapy with the following surgical procedures:

> Total and Reverse Shoulder Replacement
> Total and partial knee replacement
> Total and partial hip replacement
> ACL, MCL, and/or LCL reconstructions
> Achilles Tendon Repairs
> Hip and Shoulder labral repairs, replacements
> Menisectomies and Meniscal Repairs
> Spinal Fusions of the neck or back
> Discectomies and minimally invasive microdisectomies
> Wrist flexor tendon repairs
> Ulnar nerve release
> And many more!

*Id.*

61.    DPT also offers "Fall Prevention Therapy" which incorporates the use of "extensive, evidenced-based balance tests and measures to identify possible risk for falls and to recognize other balance disorders." *Id.* DPT provides "in-home assessment to eliminate barriers and identify safety risks in the home environment which may contribute to falls and injuries." It also screens for and treats "Benign Positional Vertigo." *Id.*

62.    DPT offers "Vestibular Rehabilitation Therapy" which treats "conditions caused by concussions and post-concussive syndrome, headaches and migraines, and vertigo." *Id.*

63.    DPT offers "Specialty Therapies" which constitute a "specialized treatment approach that consists of 'hands-on' techniques designed to mobilize

joints, muscle, connective tissue, and nerves in order to facilitate healing and restore function." *Id.*

64.    DPT's manual physical therapists treat acute and chronic conditions for "the head, neck, back, arms and legs" and it takes "every step to facilitate efficient and effective care using techniques supported by evidence-based medicine to provide you with comprehensive manual therapy services." *Id.*

65.    DPT offers "Orthopedic Manual Therapy" which is a specialized area of physical therapy designated to manage "neuromusculoskeletal conditions, based on clinical reasoning." *Id.*

66.    DPT clinicians have received "extensive formal education and training to be proficient in utilizing a variety of manual therapy skills," including "soft tissue manipulation, scar tissue release, myofascial release, massage, joint and spine mobilization and manipulation." *Id.*

67.    DPT offers physical therapy for injured workers and Work Conditioning, Worker's Compensation Case Consultation, Functional Capacity Evaluations, Expert Testimony, and MWR Industrial Testing Programs. *Id.*

68.    DPT offers treatment for chronic pain "using a variety of hands-on techniques to help the patient more comfortable while DPT explores what types of movement will help rebuild function." *Id.*

69.      "DPT offers FREE Upper Extremity injury screenings and a therapy staff with Certified Hand Therapist (CHT) certification." *Id.* (Emphasis added).   Further, "…CHT certification has a rigorous curriculum focusing on solely hand, arm, and shoulder rehabilitation techniques, …and specialists create custom splints that meet …patient's physician requirements" and [t]hese splints can provide support and/or increase joint mobility as [the] injury or condition heals." *Id.* Also, DPT's therapists "work and communicate closely with attending physicians." *Id.*

70.      DPT offers "Work Conditioning" which uses "stretching, strengthening, and cardiovascular exercises tailored to the worker's deficits, and job simulation and functional circuits which mirror the job tasks." *Id.*

71.      DPT also provides sports therapy and MWR Industrial Testing Programs. *Id.*

*Relator*

72.      Relator is Board Certified in Occupational Therapy and is a Certified Hand Therapist ("CHT") through the Hand Therapy Certification Commission.

73.      A CHT is a post-professional certification that can be obtained by a licensed physical therapist or occupational therapist.

74.      From February 2019 until August 2021, Relator worked as an OT at DPT in Michigan.

75.    Relator's duties at DPT included communication with physicians to develop professional relationships in order to provide the best patient care, engaging in active listening to fully understand patient concerns and goals to ensure optimal client centered care, fabricating custom orthotics to manage post-surgical and chronic upper extremity disabilities, collaborating with patients regarding the creative use of adaptive equipment and activity modifications, building treatment plans for patients recovering from fragile surgeries and traumas in accordance with best practice protocols and physician preferences.

*DPT and DPT's Management Structure*

76.    Defendant DPT operates in several states in the Midwest including Illinois,    Michigan,    and    Wisconsin    with    more    than    70    sites. https://doctorsofphysicaltherapy.com/ (last viewed on 4-21-2022).

77.    Defendant A. Kraai, is the owner and President of DPT.

78.    Defendant Bender, from on or about July 2017, to present is DPT's Chief Operations Officer.

79.    Defendant Von Steenburg-Allen is DPT's Director of Operations-Michigan.

80.    Defendant M. Kraai, is D. Kraai's mother and during Relator's tenure with DPT, served as DPT's Compliance Officer.

81.    Defendant Todd is a licensed Physical Therapy Assistant employed with DPT.

*Physical Therapists*

82.    PTs "help injured or ill people improve movement and manage pain" and play an important part in "…preventive care, rehabilitation, and treatment for patients with chronic conditions, illnesses, or injuries." https://www.bls.gov/ooh/healthcare/mobile/physical-therapists.htm#:~:text=Physical%20therapists%20evaluate%20and%20record,conditions%2C%20illnesses%2C%20or%20injuries.   (last viewed on 4-26-22).

83.    Typically, a PT's duties include 1) the review of the patient's medical records and referral notes from doctors, surgeons or other providers, 2) diagnosis of patient's "functions and movements by observing them stand or walk and by listening to their concerns", 3) development of the patient's  "individualized plan[] of care", which outlines his/her "goals and the expected outcomes…" 4) utilizes "exercises, stretching maneuvers, hands-on therapy, and equipment to ease patients' pain, help them increase their mobility, prevent further pain or injury, and facilitate health and wellness", 5) evaluates and records a patient's "progress, modifying the plan of care and trying new treatments as needed", and 6) educates a patient and his/her family about the "recovery process and how to cope with challenges throughout the process." *Id.*

84.    PTs treat patients of all ages suffering from "functional problems resulting from back and neck injuries; sprains, strains, and fractures; arthritis; amputations; neurological disorders, such as stroke or cerebral palsy; injuries related to work and sports; and other conditions." *Id.*

85.    Techniques employed by PTs include "…exercises; training in functional movement, which may include the use of equipment such as canes, crutches, wheelchairs, and walkers; and special movements of joints, muscles, and other soft tissue to improve mobility and decrease pain." *Id.*

86.    PTs treat a variety of patients including recovery from strokes, auto accidents, sports injuries, etc. *Id.* Some PTs specialize in a specific kind of care like orthopedics or geriatrics. *Id.* PTs also assist patients "maintain or improve mobility by developing fitness and wellness programs that encourage healthy, active lifestyles." *Id.*

87.    PTs are "part of a healthcare team, overseeing the work of physical therapist assistants and aides and consulting with physicians and surgeons and other specialists." *Id.*

88.    PTts are health care professionals who evaluate and treat people with health problems resulting from injury or disease. https://npidb.org/doctors/respiratory_developmental_rehabilitative/physical-therapist_225100000x/1386650448.aspx  (last viewed on 4-22-22).

89.    In addition,

(a) [PTs] assess joint motion, muscle strength and endurance, function of heart and lungs, and performance of activities required in daily living, among other responsibilities. Treatment includes therapeutic exercises, cardiovascular endurance training, and training in activities of daily living.

(b) A [PT] is a person qualified by an accredited program in physical therapy, licensed by the state, and practicing within the scope of that license. PTs treat disease, injury, or loss of a bodily part by physical means, such as the application of light, heat, cold, water, electricity, massage and exercise. They develop treatment plans based upon each patient's strengths, weaknesses, range of motion and ability to function.

(c) A health professional who specializes in physical therapy- the health care field concerned primarily with the treatment of disorders with physical agents and methods, such as massage, manipulation, therapeutic exercises, cold, heat (including short-wave, microwave, and ultrasonic diathermy), hydrotherapy, electric stimulation and light to assist in rehabilitating patients and in restoring normal function after an illness or injury.

*Id.*

*Occupational Therapists*

90.    OTs typically provide treatment to patients who are "…injured, ill, or disabled patients through the therapeutic use of everyday activities" by helping them "…develop, recover, improve, as well as maintain the skills needed for daily living and working." https://www.bls.gov/ooh/healthcare/occupational-therapists.htm#tab-2 (last viewed on 4-26-22).

91.    An OT's duties include a) "reviewing a patient's medical history, asking him/her  questions, and observing him/her them doing tasks," b) evaluating his/her "condition and needs", c) developing a patient's treatment plan with

specific "goals and types of activities that will be used to help the patient work toward those goals", d) helping patients with "disabilities perform different tasks, such as teaching a stroke victim how to get dressed", e) demonstrating exercises, f) evaluating a "patient's home or workplace and, on the basis of the patient's health needs, identify potential improvements…", g) educating a patient's family and employer on patient's care and accommodations, h) recommending and instruction on special equipment, i) Assessing and recording a patient's "activities and progress for patient evaluations, for billing, and for reporting to physicians and other healthcare providers", j) patients with permanent disabilities, frequently require assistance to perform activities of daily living, and OTs educate patients on use of adaptive equipment, like "leg braces, wheelchairs, and eating aids" with the goal of greater independence. *Id.*

92. OTs also oversee the work of occupational therapy assistants and aides.https://www.bls.gov/ooh/healthcare/occupational-therapists.htm#tab-2 (last viewed on 4-26-22).

*Relator's History With DPT*

93. During Relator's tenure with DPT she worked at two different DPT Lansing area clinics (hereafter DPT Lansing) providing hand therapy services. The entities are located at: 4660 S. Hagadorn Rd., Suite 160, East Lansing, Michigan and 4052 Legacy Parkway, Suite 100, Lansing, Michigan.

94.    The bulk of patients that received treatment at DPT Lansing were referred to them by an area hand surgeon Dr. James Clarkson.

**False Claims Schemes at DPT**

*A.    Unnecessary Services*

95.    Throughout Relator's tenure with DPT Defendants Bender and Von Steenburg-Allen pressured OTs and PTs to provide services beyond what was necessary for the patients' conditions for the purpose of obtaining more revenue/billable units.

96.    By way of example, hand therapy patients typically require 30-45 minutes of treatment twice weekly with variations according to severity, clinical presentation, and clinician preference.

97.    Defendants Von Steenburg-Allen and Bender pressured OTs and PTs to see patients for 75-90 minutes to boost revenue.

98.    An OT hand therapy treatment session lasting 75-90 minutes is far outside the professional norm for hand therapy.

99.    DPT's directive to provide 75-90 minutes of therapy resulted in OTs and PTs providing unnecessary services as a method for inflating the time spent with the patient.

100.   Relator has worked with many PTs throughout her OT career, during which time she observed that PT appointments at treatment facilities other than DPT typically lasted/last 30-45 minutes.

101.   Most of the unnecessary OT and PT services provided at DPT were in the form of repetitive, simple tabletop exercises like: a) picking up as many pinto beans as possible, one-at-a-time (3 trials in a row), b) picking up a marble one-at-a-time and placing in bin, c) picking up sponges one at a time, d) putting clothes pins on a dowel e) doing repetitions of the home exercise program even though the patient is already independent with these exercises and f) squeezing putty.

102.   Patients were asked to perform all the exercises that have ever been recorded during their course of therapy including exercises that had become too easy and are no longer providing a therapeutic benefit.

103.   OT patients at DPT did almost all the same exercises. If the patient progressed in his/her exercise program, he/she continued to perform the earlier exercises that were no longer challenging along with new exercises.

104.   Simple tabletop exercises are unskilled exercises that OTs do not supervise. At most an OT aide would provide supervision of unskilled tabletop exercises. However, DPT falsely billed these services as OT supervised services.

105.   On March 26, 2020, Defendant A. Kraai, sent an email to "DPT All Users", which included Relator, regarding the subject "All ads."

106.    The email contained copies of ads DPT placed on the internet during the COVID shutdown in Michigan when the entity was supposed to be limiting the number of patients seen and triaging patients to treat only those with emergencies.

107.    The Governor issued an Executive Order 2020-114 that governed outpatient healthcare treatment.   The Executive Order was designed to protect Michigan's workers from COVID-19 and required limiting appointments to allow for 6 feet of social distancing and to utilize telehealth to the extent possible.

108.    There was also a directive from Michigan Department of Health and Human Services (MDHHS) which provided guidance on triaging patients to those who could not delay treatment, but not necessarily an emergency.

109.    For example, a patient who just had surgery would be seen for therapy because his/her post operative care would be critical, while someone with arthritis pain could wait for therapy.

110.    Despite the MDHHS's directive, DPT placed ads on its Facebook page encouraging patients who had their elective surgery cancelled due to the COVID shutdown to seek appointments for therapy as follows:











11:48

Did you have to cancel your elective surgery because of COVID-19? While you know you did the right thing, you shouldn't have to suffe.! Seeing a physical therapist BEFORE your surgery could help. "Pre-hab" is a great choice for you.

We at #DPTRed can help you during this extra time before your surgery to get stronger, more mobile, and overall healthy leading to a more successful outcome post-surgery. We can work on your injured joint and other surrounding tissues.

Reach out to your local Doctors of Physical Therapy today to see if "pre-hab" is a good option for you – we would love to work with you either in the clinic or virtually! See link in Bio

#getbetterfaster #telehealth #choosePT #virtualhealth #stopthespread #physicaltherapy #prehab #electivesurgery #orthopedics



**Elective surgery cancelled for this month? You don't have to suffer!**



14                          28 Shares

Call Now          •••

facebook.com

{H0924071.1}



**Doctors of Physical Therapy**
November 25, 2020 at 10:12 AM · 🌐

With many hospitals preparing to conserve resources, some surgeries are being postponed. We can help! Studies show getting physical therapy prior to surgery can help reduce pain, enhance function and greatly...
More



👍 5                                    3 Shares

👍 Like        💬 Comment        ↪ Share

**Doctors of Physical Therapy**
November 24, 2020 at 1:43 PM · 🌐

Visit our website, schedule an appointment, get better faster



{H0924071.1}



*Treatment Standards*

111.   The *Diagnosis and Treatment Manual for Physicians & Therapists*, 5th Edition, Vol. 1 (hereafter "Manual") sets forth the standards for course of care for upper extremity treatment guidelines for shoulder, elbow, wrist, and hand.

**Amputation at the Digital Level**

112.  By way of example, Chapter 1 of the Manual addresses treatment for amputation at the digital level as follows:

"Following a traumatic amputation, a revision is performed to contour the distal most portion of the bone and to maximize soft tissue coverage of the stump" with the goals of maximizing comfort and avoiding the breakdown of skin when pressure is applied. *Id.* p. 4.

a.    **POSTOPERATIVE REHABILITATION**

**3 - 5 Days Postop**

An initial evaluation is performed.

"The postoperative dressing is removed" …and [reapplied with new dressing] which is "changed 2 to 3 times a day" …  per the Patient Handout.

*Id.*

Active and passive range-of-motion (ROM) exercises are initiated to the digits 3 to 4 times a day. Great care is taken to avoid pressure on the tip of the amputated stump.

A custom-fabricated tip protector orthosis is fabricated to wear pm. If multiple digits are involved, a static hand based orthosis may be fabricated to include the involved digits. During the first 2 - 3 weeks following surgery, wearing the orthosis is highly recommended. The orthosis provides protection for the distal stump(s) and assists in minimizing pain.

It is important to explain to the patient phantom pain/phantom sensation, and to openly discuss the psychological impact of the traumatic loss.

*Id.*

## 10 -14 Days Postop

After sutures are removed, and assuming "the wound is healed, scar massage with lotion, along with manual desensitization exercises may be initiated 3 - 4 times a day for 10 minute sessions." *Id.*

> CobanTM should be continued until the digital edema has resolved. Once the stump is non-tender, a SiliposTM gel cap may be considered to remodel the stump, further reduce edema, remodel the scar, and provide external protection for the tip of the digit.

> ROM exercises are continued. If PROM is limited, typically in flexion, a custom-fabricated dynamic orthosis may be fitted to increase passive flexion. Alternatives to fabricating an orthosis include dorsal taping of the digits or a flexion glove.

> Strengthening exercises may be initiated. Typically, putty is easy for the patient to use. A hand exerciser may be added if strength remains limited.

*Id.*

## b.    CONSIDERATIONS

A neuroma can develop. "Desensitization techniques and/or TENS may be helpful. Should the pain associated with the neuroma persist, surgery is an option to bury the neuroma in bone or soft tissue or to resect the neuroma." *Id.* (Emphasis supplied.)

*Patients are typically seen for 3-5 visits following digital level amputations.* *Id.* (Emphasis added).

### c.    COSMETIC PROSTHESES

A limited number of patients may be appropriate for a cosmetic prosthesis as patients may "have difficulty adjusting to the cosmetic appearance of the amputation… and the prosthesis may aid in "adjusting to the loss or may be an important adjunct to daily living." *Id.* (Emphasis supplied).

113.    Contrary to the above guidelines from the Manual addressing post operative therapy following traumatic amputation, Relator and other DPT therapists were directed by Defendant Von Steenburg-Allen to provide each patient with at least 18 visits with a frequency of three times per week.

114.    If a therapist failed to see a patient three times per week, Defendant Von Steenburg-Allen would send an email to the therapist requesting that he/she justify why he/she did not see his/her patient three times that week.

115.    Further, DPT routinely kept its patients on the caseload for at least six weeks and it was very common for patients to be retained on therapists' caseloads for 12 weeks and sometimes more than 12 weeks.

116.    The main driver of the high number of visits per patient was DPT's expectation that therapists see their patients three times per week.

117.    A therapist cannot expedite bone healing, tendon healing or ligament healing.  They can help address deficits related to injury, surgery or disease and provide education to prevent secondary complications.

118. Nevertheless, Relator and the other therapists were advised by Von Steenburg-Allen to continue the frequency of three times per week during the protective phase of therapy even though these patients were not able to progress until further healing had occurred.

119. Patients should have been provided a thorough home therapy program and intermittent monitoring until the patient can be progressed. Although there may be instances when a patient has legitimate deficits to address in the early stages, this is not the norm.

120. Defendant Von Steenberg-Allen focused on therapists keeping their weekly visit numbers and units high. Because therapists, including Relator, were evaluated based on those metrics, it would be a threat to their job security to drop frequency, reduce duration of the visit or discharge a patient.

121. Some conditions may take several weeks to heal (which is not the case for revision amputation described above). However, if the patient is independent with exercise and not having significant complications, which is true in most cases, there is no need to see the patient multiple times per week or even every week because there is nothing new that the therapist can add to the therapy program until further healing has occurred.

122. Defendant Von Steenburg-Allen still made the therapists see these patients three times per week even though they could not obtain progress with

these patients and the therapists were not providing skilled treatment, because Defendants mandate that the therapists had to schedule 55-60 visits patients in each week. It was not in the therapists' best interests to discharge patients or to decrease the frequency of patients' visits because to do so would result in a failure to meet DPT's mandated productivity goals.

123.    At DPT, it was very common for a patient to remain on the therapist's caseload until his/her insurance benefits were exhausted.

124.    Throughout Relator's employment with DPT she observed Defendant Von Steenburg-Allen aggressively enforcing DPT's productivity standards.

125.    Relator witnessed Defendant Von Steenburg-Allen fire multiple therapists and job security for therapists was tenuous.

126.    Clinical decision making was heavily influenced by DPT's strongly enforced administrative rules and the productivity requirements to increase revenue.

**TRANSMETACARPAL AMPUTATION**

127.    Chapter 1 of the Manual also addresses therapy for Transmetacarpal amputations. *Id.* at 6.

a.    **OVERVIEW**

Following a traumatic amputation, a revision is performed to contour the distal most portion of the bones and to maximize soft tissue coverage of the distal stump. The goals are to provide maximum comfort to the hand and avoid skin breakdown when pressure is applied…

*Id.*

### b.    POSTOPERATIVE REHABILITATION

**3 — 5 Days Postop**

After performing an initial evaluation,

[s]lowly remove the dressing and give the patient some time to look at the hand, if they are ready. A new light compressive dressing is applied to moderate and gradually reduce the edema. In addition, the dressing is utilized to assist with contouring the wound edges.

Active and active-assist range-of-motion (ROM) exercises are initiated to the remaining digits and wrist 3 to 4 times a day.

A custom-fabricated hand based static orthosis is fitted to wear between exercise sessions and at night…*Id.*

Importantly, the patient is educated on "phantom pain/phantom sensation… and… the psychological impact of the traumatic loss…" *Id.*

**10 -14 Days Postop**

After the sutures are removed, and assuming the wound has healed, "scar massage with lotion, along with manual desensitization exercises are initiated 3 — 4 times a day for 5–10-minute sessions."  Further, continue control of edema which may be done with "[a]n elastic stockinette (sewn at the distal end to cover the hand) may be used for edema control and stump remodeling."  *Id.* (Emphasis supplied).

Also, "A & PROM exercises are continued 3-4 times a day."

A neuroma can develop. "Desensitization techniques and/or TENS may be helpful. Should the pain associated with the neuroma persist, surgery is an option to bury the neuroma in bone or soft tissue or to resect the neuroma." *Id.*

**3 Weeks Postop**

Controlling edema remains a key component of therapy due to it being "congested in the hand." A variety of treatment options for edema include: "gradual deep tissue massage proximally along the entire extremity and then distally along the remaining longitudinal and transverse arches of the hand, wearing elastic stockinettes (customized to the hand) at night and then as needed during the day, and NMES[2] as needed for the thumb and intact thenar and hypothenar intrinsics." *Id.*

Further, home therapy programs "place emphasis on manual desensitization and scar massage with lotion." *Id.*

"The patient should begin using the hand for specific activities" in accordance with the therapist's guidance… *Id.*

The patient should be provided with "self-help devices that can facilitate the basic ADLs" and this "may include simple items such as built up handles that may be used for hair brushes, toothbrushes and eating utensils." *Id.* at 7. "…The patient

---

[2] "Neuromuscular Electrical Stimulation or NMES uses a device that sends electrical impulses to nerves. This input causes muscles to contract. The electrical stimulation can increase strength and range of motion, and offset the effects of disuse." https://www.cincinnatichildrens.org/service/o/ot-pt/electrical-stiumulation

can determine when they are ready to begin developing the ability to use the hand in ADLs."

...

"Guidance on adjustments for exercise where holding onto weights, bands etc. are necessary can be problem-solved by the therapist." *Id.*

### 4 Weeks Postop

Strengthening exercises may be started and "[p]utty is easy for the patient to use for thumb strengthening. Wrist strengthening may be initiated with the smaller cuff weights." *Id.*

### 5 Weeks Postop

"...The therapist can assist with workplace modifications and devices to assist at work." *Id.*

### 6 Weeks Postop

..." Patients are typically seen for 6-8 visits following the transmetacarpal amputation." *Id.* (Emphasis supplied).

### c.    CONSIDERATIONS

"The patient may become a candidate for a partial hand prosthesis or a cosmetic prosthesis..." as this device "can enhance hand function with specific tasks..." and "are indicated for multiple digit or partial hand amputations." *Id.* "Therapists can custom-fabricate templates for the partial hand prosthesis..."

Further, "[o]nce the optimal orthosis is fabricated and worn for a period of time the prosthetist and therapist can assist the patient in determining the optimal prosthesis for their individual needs." *Id.*

128.    Contrary to the above quoted excerpts from the Manual addressing post operative therapy following transmetacarpal amputation, Relator and other DPT therapists were directed by Defendant Von Steenburg-Allen to provide 18 visits.

129.    If a therapist failed to see a patient three times per week, Defendant Von Steenburg-Allen would send an email to the therapist requesting that he/she justify why he/she did not see his/her patient three times that week.

130.    Further, DPT routinely kept its patients on the caseload for at least six weeks and it was very common for patients to be retained on therapists' caseloads for 12 weeks and sometimes more than 12 weeks.

**ARTHODESIS**

131.    Chapter 3 of the Manual addresses, in part, postoperative rehabilitation for arthrodesis which is the "...fusion of two or more bones in a joint." Further,

> In this process, the diseased cartilage is removed, the bone ends are cut off, and the two bone ends are fused into one solid bone with metal internal fixation. There is no further motion in the joint, but it is stabilized and, most importantly, pain caused by instability is eliminated.

https://www.hss.edu/conditionlist_arthrodesis.asp#:~:text=Arthrodesis%20(Fusion
),bone%20with%20metal%20internal%20fixation. (last viewed 5-5-22).

### a.    POSTOPERATIVE REHABILITATION

**"3 - 5 Days Postop"**

    ….

"A protective orthosis is custom-fabricated and carefully fitted to the fused joint
for continuous wear…Whenever possible, only the involved joint is included in the
orthosis."   (Manual at 20).  Further, "[a]ctive and passive ROM[3] exercises may be
initiated to all uninvolved joints."  *Id.*

**"10 – 14 Days Postop"**

… "Protecting fine motor skills, to adjust the fusion, is recommended.
Assisting the patient with alternative way to perform specific motor tasks may be
necessary." *Id.*

**"4 Weeks Postop"**

… "Once the fusion is clinically healed (as determined by the surgeon), a
progressive strengthening program may be initiated or needed. *Id.*

### b.    "CONSIDERATIONS"

*"Typically, 1-3 therapy visits are adequate following joint fusion."* *Id.* (Emphasis
added).

---

[3]  ROM   is   an   acronym   for   range   of   motion.   https://medical-
dictionary.thefreedictionary.com/ROM (last viewed on 5-5-22).

132. Contrary to the guidelines from the Manual addressing post operative therapy following trans metacarpal amputation, Relator and other DPT therapists were directed by Defendant Von Steenburg-Allen to provide 18 visits.

133. If a therapist failed to see a patient three times per week, Defendant Von Steenburg-Allen would send an email to the therapist requesting that he/she justify why he/she did not see his/her patient three times that week.

134. Further, DPT routinely kept its patients on the caseload for at least six weeks and it was very common for patients to be retained on therapists' caseloads for 12 weeks and sometimes more than 12 weeks.

## MUCOUS CYSTS

135. Chapter 14 of the Manual addresses, in part, non-surgical and surgical management of Mucous Cysts. *Id*. at 116.

### a.    OVERVIEW

"Digital mucous cysts (DMCs) are benign ganglion cysts of the digits" and are commonly "located along the dorsal base of the distal interphalangeal (DIP) joints or may be in the proximal nail fold..." usually "found in the hands and occasionally in the toes." *Id*. ... "Osteoarthritis may be present along the DIP joints where the cyst develops...and "[a]s the cyst gets larger, pain increases and may interfere with function of the hand." *Id*.

**b.    NON-SURGICAL MANAGEMENT**

The non-surgical management of these cysts may include corticosteroids and an antibiotic if there is an infection. *Id.*

**c.    NON-SURGICAL MANAGEMENT - THERAPY**

"A custom-fabricated finger orthosis, immobilizing the DIP joint, is fitted to allow the symptoms to diminish" and is "worn until the soft tissues become quiescent." *Id.*

**d.    SURGICAL MANAGEMENT**

Surgery to remove the cyst is recommended if the cysts recur, or there is "persistent drainage or recurrent infection." *Id.*

…

**e.    POSTOPERATIVE REHABILITATION**

**3 Days Postop**

"The postop dressing is removed" and wound care is started..." *Id.*  Also, [a] baseline initial evaluation is performed" to "…include a description of the wound, wound measurements, drainage, erythema, edema, pain, functional limitations and ROM measurements." *Id.*

Both "[a]ctive and active-assist exercises may be initiated 3-4 times a day to the MP and PIP joint, ± 25 repetitions." *Id.*

A "custom-fabricated finger orthosis" is "fitted to the DIP joint" to protect the "incision site and for comfort…" The orthosis must be worn at times "until the incision site is healed. This is important as the incision site is over a joint and can easily separate." *Id.*

Patient education handout "consists of learning the steps to apply a new sterile dressing each day…" *Id.*

**10 -14 Days Postop**

If the skin edges are healed, then removal of sutures is proper. *Id.* "2-3 days post suture removal, scar massage with lotion may be initiated 2-3 times a day for approximately 3 minutes…" *Id.*

**10 - 14 Days Postop**

"A small scar pad may be applied over the scar…" *Id.* at 117 Also, "2-3 days post suture removal, gentle active ROM exercises may include the DIP joint." *Id.*

**"3 Weeks Postop**

Passive flexion exercises may be added to the therapy program" …which includes "gentle, end-range stretches for ±10 seconds." *Id.* …

**"4 Weeks Postop"**

Discontinue use of the orthosis during the day, but patients may continue to wear the orthosis at night for protection. *Id.* At this time the patient is usually able to "resume most activities." But, activities that require "repetitive motion of the

hand and a tight sustained grip may not be tolerated by the finger for 6-8 weeks." There may be "edema and pain" during these activities. *Id.*

"*Commonly, there will be 1-3 therapy visits for a mucous cyst excision.*" *Id.* (Emphasis added).

136.   Contrary to the above quoted excerpts from the Manual addressing therapy for Mucous Cysts, Relator and other DPT therapists were directed by Defendant Von Steenburg-Allen to provide 18 visits.

137.   If a therapist failed to see a patient three times per week, Defendant Von Steenburg-Allen would send an email to the therapist requesting that he/she justify why he/she did not see his/her patient three times that week.

138.   Further, DPT routinely kept its patients on the caseload for at least six weeks and it was very common for patients to be retained on therapists' caseloads for 12 weeks and sometimes more than 12 weeks.

**PIP JOINT DORSAL DISLOCATION WITHOUT FRACTURE**

139.   Chapter 15 of the Manual addresses, in part, treatment a PIP[4] joint dorsal dislocation without a fracture. *Id.* at 119. This injury

---

[4] The proximal interphalangeal (PIP) joints are commonly known as the middle knuckles of the fingers. The thumb does not have a PIP joint. In medical terminology, PIP joints are synovial joints located where two phalanges meet. Phalanges are the bones in the fingers, thumbs, and toes. A PIP joint is a hinge joint, meaning that it bends and straightens along one plane with little to no side-to-side movement. https://www.arthritis-health.com/glossary/proximal-interphalangeal-pip-joints (last viewed 5-19-22).

...occurs when the middle phalanx dislocates dorsal to the axis of the PIP joint and in relationship to the proximal phalanx. Through the dorsal dislocation, both the volar plate and collateral ligaments have been attenuated. Dorsal dislocations of the PIP joint are common.

*Id.*

...

After "the dislocation has been reduced into anatomical alignment the finger is placed in a semi-flexed posture and immobilized." *Id.*

### a.     THE NON-SURGICAL MANAGEMENT THERAPY

**"1 - 3 Days Post Reduction"**

An initial evaluation is performed which must "assess for PIP joint laxity in other digits and joints." ... Also, "[a] custom-fabricated dorsal blocking orthosis (DBO) is fitted with the PIP joint positioned in 10° of flexion for continual wear" ...which "maintains the reduction of the PIP joint and the proper anatomical position." *Id.*

...

Both "active and passive flexion and active extension exercises may be initiated" 3 to 4 times a day, 25 repetitions, "within the restraints of the orthosis." *Id.*

**"7 - 10 Days Post Reduction"**

"...[E]xercise sessions may be increased to ±6 times a day" as needed. *Id.*

**"14 - 21 Days Post Reduction"**

At this point, "[a] custom-fabricated dynamic flexion orthosis may be added to increase PIN and DIPJ flexion, 2-3 times a day, 20 minutes…." *Id.*

"**4 Weeks Post Reduction** [t]he DBO is adjusted to 0° of extension." *Id.*

"**5 Weeks Post Reduction** [t]he DBO may be discontinued and buddy tapes initiated. Should the patient have joint laxity and tendency toward PIP joint hyperextension, continue the orthosis one additional week." *Id.*

"**6 Weeks Post Reduction**" at this juncture, "[g]entle passive extension may be initiated to the PIP joint, when extension is limited…" *Id.*

"**7 Weeks Post Reduction**" at this time, "[i]f a PIP joint flexion contracture should begin to develop, a pre-fabricated orthosis such as a safety pin splint/orthosis or LMB PIPJ extension orthosis may be initiated for the PIP joint." *Id.*

…

**b.    "CONSIDERATIONS"**

Usually, this injury has an excellent outcome. "*Typically, therapists can anticipate restoring normal range of motion with few therapy visits and an uneventful course of therapy.*" *Id.* (Emphasis added in part and supplied in part.)

140.    Contrary to the above quoted excerpts from the Manual addressing therapy for PIP joint dorsal dislocation without fracture, Relator and other DPT therapists were directed by Defendant Von Steenburg-Allen to provide 18 visits.

141.    If a therapist failed to see a patient three times per week, Defendant Von Steenburg-Allen would send an email to the therapist requesting that he/she justify why he/she did not see his/her patient three times that week.

142.    Further, DPT routinely kept its patients on the caseload for at least six weeks and it was very common for patients to be retained on therapists' caseloads for 12 weeks and sometimes more than 12 weeks.

## METACARPAL FRACTURES CLOSED REDUCTION

143.    Chapter 23 of the Manual addresses, in part, the treatment for metacarpal fractures closed reduction. *Id.* at 256-57. The medical management of these types of fractures after the fracture is "reduced, the hand and wrist is immobilized in a bulky compressive dressing or cast." Thereafter, the non-surgical therapy is:

a.    **NON-SURGICAL THERAPY**

**"3 - 5 Days (bulky dressing with rigid immobilization)"**

Removal of the bulky dressing and an "initial evaluation is performed." *Id.* at 256 (Emphasis supplied).  If no cast is applied, then "therapy is ordered to custom-fabricate a hand-based or forearm-based orthosis with the MP joints in 45° - 65° flexion and the IP joints free to move." *Id.* Where an "index or middle finger metacarpal fracture" occurs, "both the index and middle fingers are included in the

orthosis." Also, where the "ring or small finger metacarpal" is fractured, "the ring and small are included in the orthosis." *Id.*

If the fracture is non-displaced or minimally displaced, "[c]ustom-fabricated orthoses ore often indicated." *Id.* "Typically, a hand-based P1 block is used for midshaft and head/neck fractures." … *Id.*

In situations where there may be a "possible fracture displacement, or if two or more digits are involved, the orthosis includes the wrist, all four digit MP joints and a dorsal clam-shell piece." *Id.*

A stockinette for the forearm and hand or an edema glove is used from edema control. *Id.*

"AROM exercises are initiated to the digits within the confines of the orthosis 3-4 times a day, 15 repetitions." *Id.*

**"3 - 4 Weeks"**

If the doctor determines that the fracture is healing early, then removing the orthosis for "AROM exercises 4 times a day, 25 slow repetitions" is appropriate. *Id.* "The goal is to gradually increase the arc of active flexion and extension each day." … *Id.*

If the patient was "initially immobilized" in a cast, then he/she is "transitioned to a custom orthosis at this time and begin AROM exercises." *Id.* Use of a stockinette or edema glove is used to address "persistent edema." *Id.*

"NMES[5] may be initiated as needed to enhance tendon excursion…." *Id.*

**"5 - 6 Weeks"**

If the doctor states the fracture has adequately healed, then AAROM to the digits can commence. *Id.*

**"6 Weeks"**

Assuming the doctor has determined that the fracture is clinically healed, then "PROM exercises may be initiated to the digits" …and "dorsal taping may be added to increase passive flexion 2-3 times a day. Monitor for an extensor lag at the MP or PIP joints and adjust the therapy program accordingly." *Id.* (Emphasis supplied).

**7 Weeks**

Assuming, per the doctor, the fracture is clinically healed, "a custom-fabricated dynamic flexion orthosis may be initiated to increase passive flexion or resolve extrinsic extensor tightness."  It is rare that a "dynamic flexion orthosis indicated" which "[m]ost often it becomes necessary with head and neck fractures." *Id.* (Emphasis supplied).

---

[5] NMES stands for Neuromuscular Electrical Stimulation which "uses a device that sends electrical impulses to nerves. This input causes muscles to contract. The electrical stimulation can increase strength and range of motion, and offset the effects of disuse. It is often used to "re-train" or "re-educate" a muscle to function and to build strength after a surgery or period of disuse." https://www.cincinnatichildrens.org/service/o/ot-pt/electrical-stiumulation (last viewed 5-19-22).

{H0924071.1}

**7 - 8 Weeks**

Use of the orthosis is "discontinued except for heavy lifting (≥10 pounds) with the injured hand, sports, or activities requiring a tight sustained grip against resistance." *Id.* at 257. (Emphasis supplied).

Providing that the fracture is "well-healed, hand strengthening may be added, beginning with putty and/or a hand exerciser" and "[w]rist curls with a 1-3 pound weight may be initiated 1-2 times a day." *Id.* The patient's "strengthening is gradually progressed over the following month…" *Id.* Usually, a patient's overall strength is not impacted from the short period of immobilization. *Id.*

**"10 - 12 Weeks**

The physician and therapist guide the patient in return to strenuous activities that load the hand. In most cases, the patient may return to all activities at this time interval." *Id.* (Emphasis supplied).

**b.    "CONSIDERATIONS"**

This type of fracture "typically require[s] a *limited number of therapy visits*." *Id.* (Emphasis added in part and supplied in part).

…

The initial priority with therapy is achieving fracture consolidation. The immobilization must provide maximum support in lieu of the cast immobilization. Beginning exercises and reducing the wearing time in the orthosis are determined by the healing of the fracture. The type of fracture, the fracture location, and fracture stability all play a role in how quickly ROM exercises can be initiated and progressed. Clinical

assessment and radiographs guide the physician in the timing to begin ROM...

*Id.*

144.  Contrary to the above quoted excerpts from the Manual addressing post operative therapy following metacarpal fractures, Relator and other DPT therapists were directed by Defendant Von Steenburg-Allen to provide 18 visits.

145.  If a therapist failed to see a patient three times per week, Defendant Von Steenburg-Allen would send an email to the therapist requesting that he/she justify why he/she did not see his/her patient three times that week.

146.  Further, DPT routinely kept its patients on the caseload for at least six weeks and it was very common for patients to be retained on therapists' caseloads for 12 weeks and sometimes more than 12 weeks.

## POST OPERATIVE THERAPY DISTAL PHALANX TUFT FRACTURES

147.  Additionally, Chapter 23 addresses, in part, post operative therapy for "distal phalanx tuft fractures."    *Id.* at 275.  These fractures "are usually nondisplaced or comminuted fractures. They classify into tuft (tip), shaft, or articular injuries." They "usually result from a crushing mechanism such as hitting the tip of a finger with a hammer, ... and is "frequently an open fracture due to its common association with injury to the surrounding soft tissues or nail bed..." https://www.ncbi.nlm.nih.gov/books/NBK545182/#:~:text=Distal%20Phalanx,-

Distal%20phalanx%20fractures&text=Tuft%20fractures%20usually%20result%20
from,soft%20tissues%20or%20nail%20bed. (Last viewed on 5-5-22).

   a.    **"NON-SURGICAL MANAGEMENT-THERAPY"**

**"3-Days Post Surgery"** includes evaluation, a "custom-fabricated finger
orthosis" which is "fitted to the middle and distal phalanx" to immobilize the joint
and protect the fracture. *Id*. (Emphasis supplied). "Active and PROM[6] exercises are
initiated all joints, except the DIP[7] joint of the involved digit." *Id*.

   **"7 – 10 Days Post Surgery"**

   "Gentle active ROM exercises are initiated to the entire digit, including the
DIP joint, 4 times a day, 25 slow repetitions…The tip protector orthosis is worn
between the exercise sessions." *Id*. (Emphasis supplied).

---

[6] PROM stands for Passive Range of Motion. "This is the space in which a part of
your body can move when someone or something is creating the movement, such
as a massage or physical therapist. You're not the one engaging the muscles you
would   normally   use   to   start   the   movement   and   do   the   work."
https://www.webmd.com/fitness-exercise/difference-between-passive-range-of-
motion-and-active-range-of-motion (Last viewed on 5-6-22).
PROM can also be performed independently by the patient using his/her other
hand.
[7] "The distal interphalangeal (DIP) joints are the joints closest to the tips of the
toes, fingers, and thumbs. In medical terminology, DIP joints are synovial joints
located where middle and distal phalanges meet. Phalanges are the small bones in
the fingers, thumbs, and toes. The DIP joints are hinge joints, meaning that they
bend and straighten along one plane with little to no side-to-side movement."
https://www.arthritis-health.com/glossary/distal-interphalangeal-dip-
joints#:~:text=The%20distal%20interphalangeal%20(DIP)%20joints,fingers%2C
%20thumbs%2C%20and%20toes. (Last viewed on 5-6-22).

**"4 Weeks Post Injury"**

Therapy includes, if a pin was surgically placed in the DIP joint, it is typically removed at this point. In addition to the active ROM exercises, begin "gentle self-passive exercises." *Id*. (Emphasis supplied). "Manual desensitization exercises are initiated along the distal phalanx." *Id*. (Emphasis supplied).

**"5 – 6 Weeks Post Surgery"**

Therapy includes the removal of the tip protector and gradual resumption of "normal use of the hand." Generally, this type of fracture "will recover ROM and function over a relatively short time frame (i.e., 6-8 weeks)." *Id*. (Emphasis supplied).

Further, *"[a] home program is emphasized for the therapy. It would be uncommon for the patient to be seen for more than 2-3 therapy visits." Id.* (Emphasis added).

147.   Contrary to the above quoted excerpts from the Manual addressing post operative therapy following distal phalanx tuft fractures, Relator and other DPT therapists were directed by Defendant Von Steenburg-Allen to provide 18 visits.

148.   If a therapist failed to see a patient three times per week, Defendant Von Steenburg-Allen would send an email to the therapist requesting that he/she justify why he/she did not see his/her patient three times that week. Further, DPT

routinely kept its patients on the caseload for at least six weeks and it was very common for patients to be retained on therapists' caseloads for 12 weeks and sometimes more than 12 weeks.

## ULNAR STYLOID FRACTURES

149.    Chapter 23 of the Manual also addresses therapy for "ULNAR STYLOID FRACTURE[8]" "Ulnar styloid fractures commonly result from a force to the ulnar side of the wrist. They often occur in conjunction with distal radius fractures. (*Id*. at 288).

### a.    "NON-SURGICAL MANAGEMENT"

This type of fracture "is typically not repaired and poses no threat to the stability of the distal radioulnar joint" and if it "isolated to the distal one-third of the ulnar styloid, a custom-fabricated wrist immobilization orthosis or a prefabricated wrist orthosis may be worn until the patient is relatively pain-free." *Id.*

---

[8] There are "two main bones in [the] forearm, called the ulna and radius. The ulna runs along the outside of [the] wrist, while the radius runs along the inside of [the] wrist. There's a bony projection at the end of the ulna, near [the] hand, called the ulnar styloid process," [which] fits into the cartilage of [the] wrist joint and plays an important role in the strength and flexibility of [the] wrist and forearm. Any sort of break in this area is called an ulnar styloid fracture." https://www.healthline.com/health/ulnar-styloid-fracture#:~:text=There's%20a%20bony%20projection%20at,called%20an%20ulnar%20styloid%20fracture. (Last viewed 5-6-2022).

"…A fracture to the proximal or middle one-third of the ulnar styloid may involve the TFCC, the ulnocarpal volar ligament, as well as the ECU" and "[i]f the fracture is non-displaced, closed reduction is performed" and "[a] long arm cast is applied to limit both wrist and forearm ROM until clinically healed."  Where there is a "significant fracture that is displaced, open reduction and infernal fixation is required" and "[a] long arm cast or custom-fabricated long arm orthosis is worn for±4 weeks or until the fracture is clinically healed."  *Id.*

**Non-Displaced Ulna Fracture**

The patient is put in "[a] long arm cast or a custom-fabricated long arm orthosis is fitted for continual wear, until fracture is healed at approximately 4 weeks." *Id.*

**4 Weeks Post Immobilization**

After the patient undergoes "[a]n initial evaluation…AROM exercises may begin for the "forearm and wrist 4 times a day, 15-25 slow repetitions" and "[a] distal wrist strap may allow the patient to ease into the AROM exercises for the forearm relatively pain-free." *Id.* The patient is fitted with a "…custom-fabricated wrist immobilization orthosis" which is worn at night and between exercises and it "may be removed for ADLs." *Id.*

**6 Weeks Post Immobilization**

If ordered by the doctor, "AAROM exercises are initiated for the forearm and wrist." *Id.*

**7 Weeks Post Immobilization**

If ordered by the doctor, "PROM exercises may be initiated for the forearm and wrist."

**8 Weeks Post Immobilization**

The patient may be introduced to [h]and strengthening and free weights (1-4 pounds)" and it should be stopped if this "generates pain in the wrist…" and "[t]he wrist immobilization orthosis is discontinued…" *Id.*

**Displaced Distal Ulna Fracture**

**10 Days Postop"**

The patient's dressing and sutures are removed and "[a]n initial evaluation is performed. *Id.* Application of an elastic stockinette occurs to control edema. *Id.* Massage of the scar with lotion should occur "once the incision line is completely healed..." *Id.*

"A custom-fabricated long arm orthosis is fabricated with the elbow in 90° flexion, the forearm in neutral rotation and the wrist in neutral for continual wear." *Id.* at 289.

**"3 - 4 Weeks Postop"**

Generally, "active and AAROM exercises may be initiated to the wrist and forearm" and these "[e]xercises are performed 4 times a day, 15-25 slow repetitions." … To begin ROM exercises, a physician must order it them …*" Id.*

**"6 Weeks Postop"**

At this time, "PROM exercises may be initiated to the forearm and wrist, so long as there is negligible pain." Notably, it is "important to perform any AAROM or PROM for the forearm with all passive motion being generated with the opposite hand proximal to the wrist for supination and pronation." *Id.*

**"8 Weeks Postop"**

The initiation of "[g]entle strengthening may" begin "to the hand and wrist to recapture strength" and may "…consist of putty and a hand exerciser with rubber band traction." If the patient reports "wrist pain with the hand strengthening, discontinue the strengthening." … Also, "[t]he wrist immobilization orthosis is gradually discontinued within 7-10 days." *Id.*

**"8 - 10 Weeks Postop"**

Usually, "the patient may return to work activities requiring bilateral lifting of ± 10 pounds" … and it is important "[t]o avoid activities requiring resistance or torque with supination/pronation…" *Id.*

**"12 Weeks Postop"**

"The patient may return to basically all work activities and sports" and "[t]he judgment of the surgeon and therapist are essential to progress the patient to normal activity." *Id.*

### b.    "CONSIDERATIONS"

"*With rare exception, ulnar styloid fractures progress quickly through therapy and require little rehabilitation. This is particularly true with distal tip fractures. It would be uncommon to have more than 3-4 therapy visits for this fracture…*" *Id.* (Emphasis added).

150.    Contrary to the above quoted excerpts from the Manual addressing post operative therapy following ulnar styloid fractures, Relator and other DPT therapists were directed by Defendant Von Steenburg-Allen to provide 18 visits.

151.    If a therapist failed to see a patient three times per week, Defendant Von Steenburg-Allen would send an email to the therapist requesting that he/she justify why he/she did not see his/her patient three times that week.

152.    Further, DPT routinely kept its patients on the caseload for at least six weeks and it was very common for patients to be retained on therapists' caseloads for 12 weeks and sometimes more than 12 weeks.

**CARPAL TUNNEL SYNDROME**

153.    Chapter 30 of the Manual pertains to Nerve Compression Syndromes, including Carpal Tunnel Syndrome. *Id*. at 360. The Manual addresses, in part, the Non-Surgical Management of Carpal Tunnel Syndrome.

**a.     "DESCRIPTION OF DIAGNOSIS"**

"Carpal tunnel syndrome is compression of the median nerve at the wrist level underneath the transverse carpal ligament..." *Id*. (Emphasis supplied).

**b.     "NON-SURGICAL MANAGEMENT – THERAPY"**

**"0 – 6 Weeks"**

"A custom-fabricated wrist immobilization orthosis is fitted…for continuous wear, or to wear as much as possible. Should the symptoms be present only while sleeping, the orthosis may be worn during that time frame." *Id*.

The Manual also provides, in part, "Isolated tendon excursion exercises are initiated. This includes isolated tendon gliding of the FDS and FOP of each digit, along with the hook-fist exercise. 15 repetitions, 2-3 times each day." *Id*.

"Slow, gentle median nerve gliding exercises are encouraged 1-2 a day, 5-10 repetitions. (Patient Handout)." *Id*.

**"6 Weeks"**

"The patient is re-evaluated by the physician. Symptoms are re-evaluated along with the effectiveness of the home therapy program. In many cases the

patient's symptoms have resolved or improved by conservative measures." Further, if "the patient is improving but the symptoms are not completely resolve, the patient and physician may opt to continue the conservative care for an additional month or two." *Id*. (Emphasis supplied).

### c.    "CONSIDERATIONS"

"Modalities are frequently cited as valuable in the conservative care of CTS." However, the authors of the therapy manual "transitioned away from modalities as a treatment intervention as *they did not show a direct benefit to patient outcomes*." Further, "[m]anual therapy techniques, including instrument assisted, have reflected varying degree of benefit in patients with CTS" and the authors did not include "this treatment intervention in managing CTS." *Id*. (Emphasis added).

Notably, non-surgical CTS, "…*patients are typically seen for 1-2 therapy visits*." *Id*. (Emphasis added).

154.    Contrary to the above quoted excerpts from the Manual addressing non-surgical therapy for carpal tunnel syndrome, Relator and other DPT therapists were directed by Defendant Von Steenburg-Allen to provide 18 visits.

155.    If a therapist failed to see a patient three times per week, Defendant Von Steenburg-Allen would send an email to the therapist requesting that he/she justify why he/she did not see his/her patient three times that week.

156. Further, DPT routinely kept its patients on the caseload for at least six weeks and it was very common for patients to be retained on therapists' caseloads for 12 weeks and sometimes more than 12 weeks.

157. It was very common for a person being seen for conservative treatment for carpal tunnel to be seen for 36 visits.

## TRIGGER FINGER

158. Chapter 40 of the Manual addresses therapy for Trigger Finger, which is defined as "a painful snapping or catching (triggering) of the digit upon active motion." (*Id.* at 502)

### a.     NON-SURGICAL MANAGEMENT - THERAPY

### 0 - 6 Weeks

After an initial evaluation is done, "[a] custom-fabricated, hand based MP joint flexion blocking orthosis is fitted with the MP joint immobilized in full extension" …and it "should include the involved digit only, unless it would be more comfortable to include an adjacent digit." … "It is believed this can be effective in a large percentage of patients." *Id.* The device is "fitted for continual wear (day & night), as possible."

Patients are encouraged to engage in "[p]assive and active hook-fist exercises are encouraged 2-3 times a day, 15 repetitions, with a long end stretch of 15-30 seconds." Also, massaging the "palm and between the digits provides a

pain-dampening effect." They are "encouraged to modify those activities that require repetitive grasping, a power grip or repetitive pinching." … *Id*.

**6 - 8 Weeks**

Typically, the physician is "re-evaluated by the physician at this time frame." If "the symptoms have resolved" there is a gradual discontinuation of the orthosis over a 2–3-week time period. Where the patient's "symptoms have improved, but not yet be resolved," then the "orthosis is continued for a period of 3-4 additional weeks." When the patient has not "responded to conservative, non-surgical management" then he/she "may be considered for surgical intervention." *Id*.

**b.    POINTS OF INTEREST**

Points of Interest include that "[i]n the vast majority of patients, *therapy is a one-time visit*, which includes an orthosis and home exercise program." (*Id*. at 503) (Emphasis added).

**B. Up-coding**

159. Defendants Von Steenburg-Allen and Melanie Kraii, DPT's Compliance Officer, pressured therapists to up-code their billing for services to secure the highest reimbursement.

*Improper Diversification of Codes- "Strategic Coding"*

160.  In approximately March 2021 Defendant Von Steenburg-Allen met with Relator at DPT's East Lansing clinic to review billing practices.

161.  Defendant Von Steenburg-Allen mentioned during the meeting with Relator that she had met with another therapist named Curtis Wood to discuss similar items.

162.   During the March 2021 meeting, Von Steenburg-Allen went through a list of all Relator's active patients to discuss how she could get higher reimbursement with "strategic coding."  Von Steenburg-Allen instructed Relator to use the neuro reeducation CPT code (97112) and the therapeutic activities CPT code (97530) as often as possible.

163.  Von Steenburg-Allen also told Relator to diversify her coding to use as many different codes as possible because some insurers would only pay the first unit of a billed code. Using multiple codes allowed DPT to get paid the highest amount for each code.

*CPT Code Billing*

164.  Each CPT code is billed in 15-minute units.  For example, 30 minutes of therapeutic exercise would be billed as two, 15-minute units.  So long as the activity took at least 8 minutes, the therapist billed one unit.  This is called the "8-minute rule."

165.   If the therapist is billing more than one unit for the same treatment unit, for example two units of therapeutic exercise, the subsequent second unit is reimbursed at a lower rate.

166.   Because of this decrease in the rate of reimbursement for subsequent units for the same treatment, Von Steenburg-Allen directed Relator to diversify the billing codes, to secure the reimbursement at the highest amount possible for each charge.

*Rounding Up to Next Payment Category*

167.   In addition, Defendant Von Steenburg-Allen asked Relator to round-up to hit the next payment category and explained that she was referring to getting to the next allowable unit by time.

168.   For example, the threshold to achieve two units versus one unit is 23 minutes.  Thus, if Relator spent only 20 minutes with her patient, she could only bill one unit.

169.   Von Steenburg-Allen asked Relator whether she "really kept track of the exact time" that she spent with her patients. Von Steenburg-Allen then instructed Relator to round up her time to the next unit and commented that it was unlikely any therapist was paying close enough attention to the clock to know if he/she spent 20 minutes or 23 minutes with the patient.

170.    Von Steenburg-Allen added that if every therapist assumed they met the next time threshold and billed the increased time, it would add up to significant revenue gains companywide.

*Improper Use of CPT 97112 for Hot Pack Treatments*

171.    On or about April 1, 2021, Relator sent an email to Compliance Officer Defendant M. Kraii regarding her concerns about Amy Salt, a therapist who was billing the neuro reeducation CPT code 97112. Amy Salt was improperly using CPT code 97112 to bill for hot pack treatments.

172.    Hot pack treatments are not skilled therapy and are therefore not billable to Medicare or Medicaid or other insurers.

173.    Ms. Salt's purported rationale for billing CPT 97112 code was that the weight of the hot pack was "proprioceptive input" and thus it fell under the 97112 CPT code.

174.    The alleged rationale for billing CPT code 97112 for application of hot packs is contrary to the definition of "proprioceptive input" and treatment of proprioception disorder as discussed below.

175.    Proprioception also known as kinesthesia, is "a body's ability to sense movement, action, and location" and is "present in every muscle movement you have."https://www.webmd.com/brain/what-is-

proprioception#:~:text=Proprioception%2C%20otherwise%20known%20as%20ki nesthesia,every%20muscle%20movement%20you%20have.(last viewed 5-12-22).

176.    Without proprioception, a person would be unable to "move without thinking about [his/her] next step, and it allows walking "without consciously thinking about where to place" each footstep." *Id.*

"The Anatomy of Proprioception"

177.    Proprioception results from sensory receptors in a person's nervous system and body. *Id.* Most of these receptors are in a person's muscles, joints, and tendons. *Id.* Thus, when a person moves, "the receptors send detailed messages to your brain about your positions and actions" and the "brain processes these messages and works" with a person's "vision, nervous system, and vestibular system to create" the perception of where his/her body is and how its moving. *Id.*

"Treatment for Proprioception Disorder"

178.    In addition to treating the underlying condition causing the proprioception disorder, treatment will probably include "exercises and therapy to improve... coordination and balance." *Id.* Common exercises include:

> Tai chi, which can boost proprioception in your legs
> Core exercises, which improve balance
> Physical therapy, which boosts strength, motor skills, and balance
> Somatosensory stimulation training, which uses exercises or electrical
> stimulation to improve proprioception

*Id.*

179.   On or about April 1, 2021, Defendant M. Kraii responded to Relator's inquiry regarding Amy Salt's use of CPT Code 97112 for use of hot packs stating that this was a) great, b) that she loved the use of it, c) told Relator to get "creative" and d) that she should just "make sure the documentation supports it."

*L Codes and CPT Codes-Double Billing*

180.   There are several codes providers can use to bill for orthotics, prosthetics, and Durable Medical Equipment (DME). https://www.webpt.com/blog/equipped-to-get-paid-billing-for-dme-orthotics-and-prosthetics-in-private-practice/ (last viewed on 6-8-22).

*CPT Codes*

181.   **97760**: Orthotics Initial Encounter Code applies to orthotic(s) management and training (which includes "assessment and fitting when not otherwise reported"), "upper extremity(ies), lower extremity(ies) and/or trunk, initial orthotic(s) encounter, each 15 minutes." https://www.webpt.com/blog/equipped-to-get-paid-billing-for-dme-orthotics-and-prosthetics-in-private-practice/ (last viewed on 6-8-22).

182.   CPT 97760 covers orthotics training and management, patient assessment and fitting if the provider has not reported it otherwise.  As of 2018, this code is used for the initial patient encounter. *Id.* Prior to 2019 therapists could use this code for subsequent visits. *Id.*

183.  If a therapist uses and "an L-code" he/she must make sure not to also bill CPT 97760, "because L-codes cover management and training in addition to building the device." https://www.webpt.com/blog/equipped-to-get-paid-billing-for-dme-orthotics-and-prosthetics-in-private-practice/ (last viewed on 6-8-22).

**97761**: Prosthetic Initial Encounter Code

184.  CPT 97761 is used for prosthetic(s) training, upper and/or lower extremity(ies), initial prosthetic(s) encounter, each 15-minutes. https://www.webpt.com/blog/equipped-to-get-paid-billing-for-dme-orthotics-and-prosthetics-in-private-practice/ (last viewed on 6-8-22). This "CPT code for any prosthetics-related instructions or interventions, including:

ADLs for Upper Extremities (UE) and Lower Extremities (LE) amputees,
Walking for LE amputees,
Donning and doffing activities,
Residual limb management, and
prosthesis-related self-care.

This code applies only to the initial encounter. *Id.*

**97763**: Orthotic and Prosthetic Management

185.  CPT 97763 applies to "Orthotic(s)/prosthetic(s) management and/or training, upper extremity(ies), lower extremity(ies), and/or trunk, subsequent orthotic(s)/prosthetic(s) encounter, each 15 minutes." *Id.*

186.  CPT codes 97760 and 97761 are used only for *initial encounters*. Otherwise, CPT 97763 is used for the same activities described by CPTs 97760

and   97761   except   it   is   used   solely   for   *subsequent*   *encounters*.
https://www.webpt.com/blog/equipped-to-get-paid-billing-for-dme-orthotics-and-prosthetics-in-private-practice/ (last viewed on 6-8-22).  (Emphasis added).

187.   As of January 1, 2018, CPT 97763 replaced 97762.  *Id.*

*L-Codes*

**L-Codes: Splinting and Bracing**

188.   The Centers for Medicare and Medicaid Services ("CMS") produces the   Healthcare   Common   Procedure   Coding   System   ("HCPCS"). https://www.nlm.nih.gov/research/umls/sourcereleasedocs/current/HCPCS/index.html#:~:text=HCPCS%20is%20a%20collection%20of,by%20Medicare%20and%20other%20insurers (last viewed on 6-8-22).

189.   The HCPCS "is a collection of standardized codes that represent medical procedures, supplies, products and services. The codes are used to facilitate the processing of health insurance claims by Medicare and other insurers." *Id.*

190.   "HCPCS is divided into two subsystems, Level I and Level II." Level I is comprised of CPT codes. *Id.* "Level II HCPCS codes identify products, supplies, and services not included in CPT" and "consist of a letter followed by four numeric digits." *Id.*

191.   L-Codes are the HCPCS codes used when the provider is billing for splints, braces, and any other services related to assessment, fabrication, and supplies—including follow-up. https://www.webpt.com/blog/equipped-to-get-paid-billing-for-dme-orthotics-and-prosthetics-in-private-practice/ (last viewed on 6-8-22)

192.   A provider who is billing L-codes, must be a certified DME provider. If the provider is not DME certified, then Medicare must be billed as follows for orthotic services:

- CPT 97760 for the initial assessment,
- Bill the patient for the device or supplies, and
- Bill 97763 for subsequent visits.

*Id.*

**Obtaining Reimbursement**

193.   For prosthetics, Medicare reimbursement includes evaluation, fitting, parts and labor, repairs due to normal wear or tear within the first 90 days of the delivery date, and adjustments made during fitting and within the first 90 days of the delivery date (not including adjustments brought on by changes in the remaining limb or a patient's level of function). *Id.*

194. For orthotics, Medicare reimbursement includes evaluation, measurement and/or fitting, fabrication and customization, materials, cost of labor, and delivery. *Id.*

195. Durable Medical Equipment Medicare Administrative Contractors ("DMEMAC") require, for certain items, a certificate of medical necessity (CMN). Each DMEMAC has "its own list of items requiring a CMN, but these lists typically include the following items osteogenesis stimulators, TENS units, wheelchairs (motorized and manual), CPAP machines, lymphedema pumps, hospital beds, support surfaces, seat lift mechanisms, and power-operated vehicles." *Id.*

196. "The HCPCS codes for Wrist-hand-finger Orthotics L3806-L3904 is a standardized code set necessary for Medicare and other health insurance providers to provide healthcare claims." https://www.aapc.com/codes/hcpcs-codes-range/269/ (last viewed on 6-8-22).

**HCPCS Code Range L3806-L3904**

*L3806-L3904 Wrist-hand-finger Orthotics*

197. **L3806** provides:

"Wrist hand finger orthosis (WHFO), includes one or more nontorsion joint(s), turnbuckles, elastic bands/springs, may include soft interface material, straps, custom fabricated, includes fitting and adjustment." *Id.*

198.  **L3807** provides:

WHFO "without joint(s), prefabricated item that has been trimmed, bent, molded, assembled, or otherwise customized to fit a specific patient by an individual with expertise." *Id*.

199.  **L3808** provides:

WHFO "rigid without joints, may include soft interface material; straps, custom fabricated, includes fitting and adjustment." *Id*.

200.  **L3809** provides:

WHFO "without joint(s), prefabricated, off-the-shelf, any type." *Id*.

201.  **L3891** provides:

"Addition to upper extremity joint, wrist or elbow, concentric adjustable torsion style mechanism for custom fabricated orthotics." *Id*.

202.  **L3900** provides:

WHFO "dynamic flexor hinge, reciprocal wrist extension/ flexion, finger flexion/extension, wrist or finger driven, custom-fabricated." *Id*.

203.  **L3901** provides:

WHFO "dynamic flexor hinge, reciprocal wrist extension/ flexion, finger flexion/extension, cable driven, custom-fabricated." *Id*.

204.  **L3904** provides:

WHFO "external powered, electric, custom fabricated."

*Id.*

205.   Defendant Von Steenburg-Allen required all therapists to charge for two codes; the L-code and the CPT code, thereby resulting in double billing.

206.   The L-codes cover the amount of time spent making the orthosis, the materials, education, and evaluation for fabrication of an orthosis.  They also cover minor adjustments to the orthosis at future visits.   The payment is the same whether the orthosis takes 20 minutes or 60 minutes to make.

207.   A CPT code is used to bill for an orthosis where it is otherwise not reported. The CPT codes are billed in 15-minute increments like other commonly used therapy codes.

208.   In the case where the training required goes above and beyond what is typical for orthosis wear, care and precautions, a CPT code can be billed on the same day as an L-code.  Billing both CPT and L-codes together is rarely done and usually occurs <u>only</u> with the use of a dynamic orthosis with moving parts that patient will have to use for specific exercises or tasks.

209.   Contrary to proper coding requirements, DPT mandated that along with billing the L-code, the therapists were required to bill the CPT to include all the time they used to fabricate, educate, and adjust orthosis for every single patient.

210.   Relator presented to Defendant Von Steenburg-Allen the CMS rules, guidance from the American Society of Hand Therapists and the American

Occupational Therapy Association which provided information that billing the L code and CPT code together was incorrect.

211.    Relator spoke with Defendant Von Steenburg-Allen about billing L-codes and CPT codes multiple times, and she also e-mailed DPT's billing department manager, Ashley Shumenaur, about this topic.

212.    Ms. Shumenaur told Relator that she had done "extensive research" on this topic and that billing both the L-Code and CPT together was allowed, and that Relator should trust her.

213.    The results of Ms. Shumenaur's alleged extensive research was never provided to Relator despite her request for it.

214.    Thereafter, Relator pressed the issue with Defendant Von Steenburg-Allen and Ms. Shumenaur. Relator was then told that the billing department dropped whichever of the two codes paid less.  Relator asked for proof that this was being done, but neither Defendant Von Steenburg-Allen nor Ms. Shumenaur provided such proof.

215.    Relator observed DPT is not in compliance with several rules, including 1) having a standard written order with all required information and 2) issuing an advanced beneficiary notice in cases where Medicare is expected to deny coverage.

216. Relator observed that DPT would often make a splint with no written order for that specific splint. It would also make a same or similar splint to one that Medicare reimbursed. Both of these cases would require an advanced beneficiary notice provided to the patient and to have the patient sign it.

217. This allows the provider to bill the patient a cash price. Otherwise, the provider is responsible for the cost.

218. Medicare will not pay for the same orthosis within five years of its creation. Medicare will not pay for an orthosis that is deemed to be similar to an orthosis it has already paid for within five years. These are two examples of when the provider should issue an advanced beneficiary notice. The use of a blanket form is not allowed by Medicare.

**False Claims Scheme Number Two**

Use of unlicensed therapy aides to provide treatment and unrealistic productivity standards leading to submission of false claims.

*Productivity Standards*

219. DPT by Defendants Von Steenburg-Allen and Bender established productivity standards at "150%." This means that while a therapist was on the clock, DPT required that 150% of the therapist's time was billable.

220. The only way a therapist could satisfy DPT's 150% productivity standard, was for the therapist to treat three or more patients simultaneously.

221. Defendant Von Steenburg-Allen pressured therapists, including Relator, to use CPT codes 97530 (therapeutic activities) and 97112 (neuromuscular reeducation) instead of the correct CPT Code of 97110 (therapeutic exercise).

222. For licensed therapists to correctly use codes 97530 and 97112 for "one-on-one" therapy, he/she must provide direct care to the patient.

223. Relator routinely observed that therapists did not provide one-on-one therapy at either the Lansing or East Lansing clinics. Rather, they routinely falsely billed codes 97530 and 97112.

224. Further, therapy aides almost always facilitated patient treatment while the therapist provided treatment to other patients. The aides facilitated patient treatment by gathering supplies and providing instructions to patient for exercises.

225. The therapist is supposed to instruct the aide as to which exercises were to be performed that day. In practice the therapy aides usually had the patient perform all the exercises that the patient had completed at his/her last session.

226. In addition, other types of treatment such as treating more than one patient at the same time, which are correctly billed under CPT code 97110 or as group therapy, Relator and other DPT therapists were instructed to falsely up code these services by using codes applicable to "one-on-one" services.

227. On October 20, 2020, Defendant Von Steenburg-Allen emailed several DPT clinicians, including Relator, regarding "Billing/Coding for what we do." The email addressed her review of how DPT staff was billing for services and "found some things we can improve." She provided "Some basic thoughts" regarding "billing for a patient is charging for what it really is."

228. With respect to billing for exercise therapy, Defendant Von Steenburg-Allen stated

> Programs should not just lump all exercise under 'Ther Ex'.[9] We perform manual, ther ex, neuromuscular, Functional Dynamic (Therapeutic Activities) and need to make sure the correct activity is billed for correctly. It also makes a huge difference from a reimbursement perspective.
>
> The time spent is another factor. It should be accurate for the time they are here and doing an activity, not a standard number that we are used to putting in. A thorough program should be 1 hr and 15 minutes to 1 hr 30 min. We don't put the time in our charges for HP or ICE. You can have it on your Procedures to bill for because it's documented but you would put N/C. We noticed when the time for heat is added in that patient is only billed for 2-3 units of care per visit. Which is probably not appropriate for time spent.
>
> Some things we identified today is:
>
> Most therapists are putting in time for HP, it shouldn't be entered with a time.
>
> Ther ex is the main code billed which alot of the activities/exercises listed are actually properly billed as neuromuscular/Therapeutic Activity and reimbursed at a better rate for the complexity.

---

[9] "Ther Ex" is an abbreviation for therapeutic exercise.

Brace adjustments/modifications need to be under the timed code for that (Not DME clinic)

I was hoping we could do a teams call on a morning to all put our thoughts together.

I've included some slides describing billing codes

229.   On February 23, 2021, Defendant Von Steenburg-Allen sent an email to the "Michigan Clinical Staff", which included Relator, regarding the prior week's visits and hours per therapist and location.  The email, in part, instructed the clinicians on how to calculate their total hours of work, noting that hours of work do not include paid time off.

230.   Further, the email stated

We are really working hard to have all disciplines handle their schedules.  If your day gets light and you can move a patient or share with another clinician to control our hours/volume right now we have to get this in line.  Please check with your CD if you're not sure how to handle this.

231.   Defendant Von Steenburg-Allen's email also reminded the Clinical Staff to "[p]lease make sure your patients are scheduled out correctly for their frequency and Duration."

232.   Critically, the email provided guidance on hours to be worked, the goal for the amount of time to be spent with each patient, the number of hours a full-time employee (FTE) worked and the goal for the number of patient visits for an FTE clinician as follows:

2/14-2/20 [workweek]
Total hours work (don't include PTO hours)
Total visits
Total visits/hours (goal 1.5)
FTE: 40/number of hours worked
FTE/visit: Fte/visits (goal 55-60)

233.   Based on Defendant Von Steenburg-Allen's direction as quoted above, it was and is physically impossible to see 55-60 patients, at 1.5 hours per patient visit in a 40-hour workweek.

234.   By way of example:

- There are 2,400 minutes in a 40-hour workweek (assuming no breaks or meal breaks).

- If an FTE sees 55 patients for 1.5 hours (90 minutes) per patient that amounts to 4,950 minutes or 82.5 hours in a 40-hour workweek.

- If an FTE sees 60 patients for 1.5 hours (90 minutes) per patient that amounts to 5,400 minutes or 90 hours in a 40-hour workweek.

235.   On March 1, 2021, Relator sent Defendant Von Steenburg-Allen, an email regarding the subject of "Medicare visit overlaps." Relator's email stated, in part,

Our Medicare patients are frequently overlapped at the front and back of the appointments and sometimes with other Medicare patients. If you refer to number 7 and number 8 of the attached CMS guidelines it

clearly states that only one-on-one care will be paid for. Exercise supervised by a therapy aide regardless of the level of supervision cannot be billed for. So, there may be times that a Medicare patient is her[e] for 60 minutes, but I can only legally bill for 1 unit. This happened to me today, I had a Medicare patient overlapped with an 8-year-old who also needed one- on-one care. I wanted to give you a heads up about these scenarios in-case you are looking through units and see only 1 charge for a 60-minute appointment.

236.  Relator also apprised Defendant Von Steenburg-Allen that "If we are scheduling evaluations and Medicare patients correctly, we will have times that we are below the 15-visit goal. Our evaluations are often overlapped as well, which is difficult for the therapist."

237.  Relator then asked "Are evaluations and Medicare patients accounted for in the FTE goals?

238.  On March 1, 2021, Defendant Von Steenburg-Allen responded to Relator's email by thanking her for "pointing out why you are billing 1 unit for Medicare patients that are overlapped with another patient and the attached Medicare guidelines you provided." Defendant Von Steenburg-Allen explained that "Direct supervision can be direct visual, direct verbal and or directly in front of the patient."

239.  On March 2, 2021, Relator emailed a reply to Defendant Von Steenburg-Allen's email seeking to clarify her email of March 1, 2021, and requesting resources and education on proper billing stating:

I wanted to clarify with my Medicare overlap yesterday. I worked

with Medicare patient for 15 minutes of manual treatment. *A tech did the additional 45 minutes of exercise and I was not supervising at all because I was removing stitches from an 8 year who was crying.  It took me a long time to get all the stitches out. Medicare patient just followed exercise log from previous session.  In this case, I don't feel comfortable charging more than the one unit for one- on-one time.*  I would appreciate any further resources and education regarding proper billing practices and will discuss when we talk later.

(Emphasis added).

240.    On March 2, 2021, Relator had a conference call with Defendants Bender and Von Steenburg-Allen regarding Medicare billing. Following their call, Relator emailed Defendants Bender and Von Steenburg-Allen thanking them for their feedback and education and seeking clarification "that it is OK to bill a 3 or even 2-unit Medicare visit without it affecting our productivity goals."

241.    Defendant Bender replied, via email,

That is a loaded question and a good one that I wish we could have had time for on the call.

In essence what we have to make sure we are doing is being as productive as possible for the care we provide.  Meaning when we are engaging with patients there should really be no time that is not codable or of value to the patient.  Then we bill according to the payers rules.  In essence bill for what you do.

*The reality if we are billing consistently 2-3 units per episode and that is the amount of care we are giving, then we are in trouble and may need to look at that from a clinical perspective.*

I hope this helps

(Emphasis added).

242.  On or about June 1, 2021, Relator provided Amy Salt with the resource created by the American Physical Therapy Association called, "Preventing Fraud, Abuse, and Waste: A Primer for Physical Therapists."

243.   On June 29, 2021, Defendant Von Steenburg-Allen emailed the East Lansing DPT staff, including Relator, Karan Daily, Amy Salt, Lindsay Rittersdorf, Alexis Richter, Steve Skorna and, Kim Buta-Blair regarding "Holiday week volume in E L for next week drops significantly compared to this week."

Hi EL,

I'm asking for immediate help with active caseloads of patients into next week the holiday week.

Our anticipated volume for this week    Next week (4 day week)

| Clinic | 225 | 162 |
| PT | 64 | 39 |
| OT | 132 | 96 |

Drop going into next week of 63 visits (25 PT visits with lots of opening's w-f and 36 OT visits)

Please look at all active patient's schedules and as they come in this week for appointments and see how we have them scheduled for next week. If they are TIW and not scheduled for that we need to think clinically what the best practice for them is and help with scheduling for Alysia.

Please investigate this today and let me know what you find.

244.  On June 30, 2021, Defendant Von Steenburg-Allen forwarded Kim

Buta-Blair's response to her June 29th email regarding "Holiday week volume in

EL for next week drops significantly compared to this week" which stated

> Karen
>
> I am on a precious vacation day and received this email to explain low numbers. I have had several evaluations the last few weeks. I will finish all notes for the end of the month today!
>
> Reasons for low # this next week, as if I need to explain and I am sure all spots if we have any will be filled with the several evaluations you are so kindly doing on Thursday. I enclosed the above note as you know it's been difficult to give coverage to EL, when we asked in the beginning of June
>
> 1) Holiday week only 4 days
>
> 2) several patients on vacation next week- holiday, (notes in chart)
>
> 3) PTA coverage removed, Heather and David in Buton for coverage there
>
> 4) PT on vacation last week so less evaluations to be placed on PTA schedules and several of our patients DC and I am on vacation this week with no coverage Today.
>
> 5) Active case Audit sent to explain after I left for my vacation, I will check into this
>
> Sorry to sound so frustrated, but this is my third vacation since April
>
> that We have one day not covered, and I am having to explain this.
>
> Thank you,
>
> Kim

245.  Also on June 30, 2021, Defendant Von Steenburg-Allen responded to

Ms. Buta-Blair's email explaining staffing, hires, staffing shortages and scheduling.

246.   Throughout her tenure with DPT, Relator attended staff meetings, usually held one time per month.

247.   Virtually, all the meetings were called by the Clinic Director, Amy Salt, all clinic staff attended these meetings, and the agendas for these meetings were circulated to staff before or at the meetings.

248.   On at least one occasion, Relator recalls that Defendant Von Steenburg-Allen called and ran meeting.

249.   The staff meetings frequently focused on productivity and revenue, and staff "hitting our units" which meant that staff billed 330 to 360 units per week based on six units per patient visit multiplied by 55 to 60 visits per week.

250.   Relator and other clinicians received and sent emails regarding the duration of treatment, the frequency of treatment, units billed, drop in patient volume and other topics tied to revenue or revenue loss.

251.   Results of a recent research study found that high productivity standards lead to increased ethical issues among therapists. https://reader.elsevier.com/reader/sd/pii/S2590109519300011?token=DF4C704DC 27BFA3666BBA25A1878285653DB7D2F3034EFBC6FD5D0512775867247B98 68559DB0E840826ADE57EEF15E6&originRegion=us-east-

1&originCreation=20220410151558 (last viewed 5-12-22).

252.  The study found, in part, that "[h]istorically, rehabilitation ethics research has largely ignored issues related to business economic factors, such as billing fraud and overuse of services." *Id*.  However, *"often the largest portion of ethical conflict in rehabilitation clinicians comes from health care reimbursement pressures and a corporate culture that expects financially driven treatment decisions." Id*. (footnotes omitted) (Emphasis added).  The study "used sample behaviors from the... Consensus Statement on Clinical Judgment in Healthcare Settings to ensure applicability to the rehabilitation industry." *Id*. (footnotes omitted). To avoid creating bias in responses, the "questions regarding unethical behavior were not strictly defined. General terms such as "inappropriate" were used to describe each behavior, and sample behaviors provided in these questions were those that were explicitly illegal or fraudulent based on governmental regulations ..." *Id*. (Emphasis added). See also, American Physical Therapy Association, American Occupational Therapy Association, American Speech, Language and Hearing Consensus statement on clinical judgment and ethics at https://www.aota.org/-/media/Corporate/Files/Practice/Ethics/APTA-AOTA-ASHA-Concensus-Statement.pdf

253.  In addition, Defendants Bender and Von Steenburg-Allen directed therapists to 1) Place clients/patients on caseload who do not meet Medicare or

other payer coverage criteria, 2) Keep clients/patients on caseload when skilled care is no longer indicated, and 3) Set inappropriate administrative requirements regarding treatment frequency, intensity, or duration.  Physical Therapy Code of Ethics  (APTA)  https://www.apta.org/siteassets/pdfs/policies/codeofethicshods06-.20-28-25.pdf.

254.    Further, DPT directed therapists to engage in conduct that violated principles 7E and 8C. *Id.*

255.    In addition, DPT routinely instructed therapists to engage in conduct that violated standards of conduct 1J, 3 (A, B, C &D), 4J and 6H.  Occupational Therapy    Code    of    Ethics    (AOTA)    found    at https://www.scota.net/resources/Documents/AOTA%202020%20Code%20of%20 Ethics.pdf#:~:text=The%202020%20Occupational%20Therapy%20Code%20of%2 0Ethics%28the%20Code%29,bene%EF%AC%81ciaries%20of%20service%20to% 20meet%20their%20occupational%20needs

**False Claims Scheme Number Three Overlapping and Double-Booking**

256.    It was common practice to overlap and double book virtually all patients.

257.    During Relator's tenure, DPT implemented a new corporate policy which was supposed to help the schedulers avoid double booking and overlapping Medicare patients.

258.    However, this policy was routinely ignored by the management and schedulers.

259.    DPT knew that Medicare will not pay for OT and PT services other than when these services are provided through one-on-one care. But, due to the high productivity standards and focus on revenue, schedulers, at the direction of DPT management, double-booked patients resulting in the treatment of overlapping patients.

**DPT's Antipathy Towards Compliance**

260.    During her employment with DPT Relator routinely observed that DPT failed to appropriately address fraud through its compliance department.

261.    By way of example, in July 2021, Relator reported to DPT's Compliance Officer Defendant M. Kraai, that Defendant Todd OTR/L, CHT, PTA grossly inflated the time she spent with patients to obtain more billable units, provided treatment beyond what is necessary to obtain more billable units and lied about treatment times to obtain more revenue.

262.    Relator ended her employment with DPT shortly after she filed the complaint regarding Defendant Todd.

263.    Defendant Todd continues to work for DPT and she was promoted to Clinic Director of the East Lansing Clinic.

264.    In addition, on or about April 1, 2021, and several dates thereafter, Relator spoke with Amy Salt, OTR/L, CHT, the Clinic Director of the East Lansing Clinic regarding her concerns with fraud and billing. Relator is aware that other employees addressed these issues with Ms. Salt as well.

265.    Ms. Salt took no action to address the false claims billing matters.

**Patient Examples**

266.    Relator recalls, by way of example, that during her tenure with DPT, the following patients: Patient 1 - M-female, Patient 2 - L-male, Patient 3 - H-male, Patient 4 – D-female, Patient 5 – S-female, and Patient 6 – J-male received unnecessary services (excessive length of appointments) and they were billed as having received one-on-one treatment while being double booked or overlapped with other patients and working with an aide, not the therapist.

## COUNT I- FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(A)(1)(A)

267.    Relator re-alleges and incorporates each allegation in each of the preceding paragraphs as if fully set forth herein and further alleges as follows:

268.    By virtue of the acts described above in the preceding paragraphs, Defendants "knowingly present[ed], or caus[ed] to be presented, false or fraudulent claims for payment or approval" in violation of 31 U.S.C. § 3729(a)(1)(A).

269.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or

authorized payment of those claims and has been damaged in an amount to be proven at trial.

## COUNT II-FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(A)(1)(B)

270.   Relator re-alleges and incorporates each allegation in the preceding paragraphs as if fully set forth herein and further alleges as follows:

271.   By virtue of the acts described above, Defendants have "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or statement that was material to false or fraudulent claims" in violation of 31 U.S.C. § 3729(a)(1)(B).

272.   The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

## COUNT III -FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(A)(1)(G)

273.   Relator re-alleges and incorporates each allegation in the preceding paragraphs as if fully set forth herein and further alleges as follows:

274.   By virtue of the acts described above, Defendants have "knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit" money to the United States in violation of 31 U.S.C. § 3729(a)(1)(G).

275.   The United States, unaware of the foregoing circumstances and

conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

## COUNT IV-MICHIGAN MEDICAID FALSE CLAIMS ACT
### M.C.L. § 400.607(1)

276.   Relator re-alleges and incorporates each allegation in the preceding paragraphs as if fully set forth herein and further alleges as follows:

277.   By virtue of the acts described above, Defendants have "ma[de] or present[ed] or cause[d] to be made or presented to an employee or officer of this state a claim under the social welfare act … upon or against the state, knowing the claim to be false" in violation of M.C.L. § 400.607(1).

278.   The State of Michigan, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

## COUNT V-MICHIGAN MEDICAID FALSE CLAIMS ACT
### M.C.L. § 400.607(2)

279.   Relator re-alleges and incorporates each allegation in the preceding paragraphs as if fully set forth herein and further alleges as follows:

280.   By virtue of the acts described above, Defendants have "ma[de] or present[ed] or cause[d] to be made or presented a claim under the social welfare act

… that [Defendants knew] falsely represents that the goods or services for which the claim is made were medically necessary in accordance with professionally accepted standards" in violation of M.C.L. § 400.607(2).

281.   The State of Michigan, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

## COUNT VI-MICHIGAN MEDICAID FALSE CLAIMS ACT
### M.C.L. § 400.607(3)

282.   Relator re-alleges and incorporates each allegation in preceding paragraphs as if fully set forth herein and further alleges as follows:

283.   By virtue of the acts described above, Defendants have "knowingly ma[de], use[d], or cause[d] to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state pertaining to a claim presented under the social welfare act" in violation of M.C.L. § 400.607(3).

284.   The State of Michigan, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator demands that judgment be entered in favor of the United States and the State of Michigan and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This prayer for relief includes three times the amount of damages to the United States and the State of Michigan plus civil penalties of no more than $11,000 and no less than $5,500 for each false claim before or on November 2, 2015, and civil penalties of no more than $22,363 and no less than $11,181 for each violation after November 2, 2015, and any other recoveries or relief provided for under the FCA, FERA and the MMFCA.

Further, Relator requests that she receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States and the State of Michigan, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that her award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

## DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff-Relator, LINDSAY ZEVCHAK, on behalf of herself, the United States of America and the State of Michigan, by and through

her attorneys, and hereby demands a jury trial in the above-captioned matter.

Respectfully submitted,

By: _____

Patricia A. Stamler (P35905)
Matthew J. Turchyn (P76482)
HERTZ SCHRAM PC
Counsel for Plaintiff-Relator
1760 S. Telegraph Road, Suite 300
Bloomfield Hills, MI 48302
(248) 335-5000
pstamler@hertzschram.com
mturchyn@hertzschram.com

Dated: July 5, 2022